PARKER, Justice.
Troy Health and Rehabilitation Center (“Troy Health”) appeals the decision by the Pike Circuit Court (“the circuit court”) to deny Troy Health’s motion to compel arbitration. We reverse and remand.

Facts and Procedural History

On May 13, 2011, Garnell Wilcoxon, who was 74 years old and living alone, suffered a stroke, awoke on the floor of his bedroom covered in sweat, feeling sore -and ■with no memory of how he had gotten there. Wilcoxon was admitted to the Troy Regional Medical Center for analysis and treatment! That same day, May 13, 2011, Wilcoxon was transferred to Flowers Hospital because he was experiencing an elevated troponin level.[1]
At Flowers Hospital, Dr. Roland Brooks was Wilcoxon’s attending physician. On May 17, 2011, pursuant to Dr. Brooks’s request for a consultation, Dr. Linda Marden examined Wilcoxon. Dr. Brooks requested the consultation because of Wilcoxon’s “mental status changes and abnormal MRI.” According to Dr. Mar-den’s notes, Wilcoxon was alert during her examination and orientated to himself and the situation but was- not orientated to time or location. Dr. Marden also noted that, during her examination, “[Wilcox-on’s] memory for recent events [was] poor and for remote events [was] fair. [Wilcox-on’s] attention and concentration [were] normal. [Wilcoxon’s] language [was] spontaneous, fluent, and grammatical, and [Wilcoxon’s] fund of knowledge [appeared] to be decreased from his baseline.”
Dr. Marden’s notes indicate that she believed that Wilcoxon suffered from hypo-magnesemia,[2] which, she believed, caused Wilcoxon’s stroke on May 13, 2011. Dr. Marden’s notes also indicate that she believed that, at the time of her examination, Wilcoxon “likely [had] severe cognitive or chronic cognitive changes associated with the nutritional depletion and toxicity of alcohol” and that Wilcoxon had “underlying dementia ... likely due to the chronic effects of alcohol....”
On May 20, 2011, Dr. Marden examined Wilcoxon again and made additional notes concerning Wilcoxon. Dr, Marden’s notes *1114 indicate that on May 20, 2011, Wilcoxon was .“still confused.” Dr. Marden’s notes also state that Wilcoxon had “dementia due to alcoholism, but still could have B-12 deficiency components.” That same day, May 20, 2011, Wilcoxon was transported to a 'facility operated or owned by Troy Health, where he was admitted; according to the medical-necessity certificate for ambulance transportation, Wilcoxon was “exhibiting signs of a decreased level of consciousness.”
In order to be admitted to Troy Health, Wilcoxon was required to sign a document titled “Troy Health & Rehabilitation Center’s Dispute Resolution Agreement” (“the 2011 arbitration agreement”). Herford Bean, Wilcoxon’s nephew, .signed the agreement as Wilcoxon’s “authorized representative.” According to the 2011 arbitration agreement, an authorized representative is permitted to sign on behalf of a Troy Health resident if the resident “is unable to consent to or sign [the] Agreement because of a physical disability or mental incompetence.... ” The 2011 arbitration agreement, states that “all claims, disputes, and controversies which are subject to this Mandatory Dispute Resolution agreement shall be resolved by binding arbitration” and that “[Troy Health] regularly engages in transactions involving interstate commerce and the services provided by [Troy Health] to [Wilcoxon] involve such interstate commerce.”
Also on May 20, 2011, employees of Troy Health completed a form concerning Wil-coxon titled “Fact Sheet.” The “Fact Sheet” indicates that Wilcoxon was diagnosed with “altered mental status” and “alcohol persistent dementia,” among other diagnoses. Troy Health employees also performed an assessment of Wilcoxon’s level of functioning. Troy Health’s assessment indicates that, at the time of Wilcox-on’s admission to Troy Health, Wilcoxon’s speech was clear; he was able to be understood; he" was able to perform acts of personal hygiene unassisted; he was walking in his room with no help from family; and he was bathing independently. On May 24, 20X1, a Troy Health employee completed an “Activity Intake Form” indicating that Wilcoxon answered questions about his interests, including, among others, his hobbies, his favorite sports teams, and his religion.
In July 2011, Wilcoxon signed a document, which was then notarized, titled “Lien for Medical Payments Under Alabama Medicaid Program.” The notary’s certification indicates that Wilcoxon was informed of the contents of the document and that he signed it voluntarily. On August 12, 2011, Wilcoxon executed a document titled “Alabama Durable Power of Attorney — Broad Powers.” That document, which was notarized, named Bean as Wilcoxon’s attomey-in-fact. The. notary’s certification indicates that Wilcoxon was fully aware of the contents of the document and that he executed the document voluntarily.
On Februaiy 15, 2012, Wilcoxon was admitted to Troy Regional Medical Center. Dr. Satinderjit Gill was Wilcoxon’s attending physician. Dr. Gill’s notes from his examination of Wilcoxon indicate that Wil-coxon had lost 40 to 50 pounds over the 3 months before his examination by Dr. Gill. Dr. Gill’s notes indicate that he and Wil-coxon discussed the possibility of Wilcoxon undergoing a procedure to insert a feeding tube in Wilcoxon and that Dr. Gill received Wilcoxon’s informed consent to perform that procedure. On February 16, 2012, Dr. Gill placed a feeding tube in Wilcoxon.
On February 18, 2012, Wilcoxon was transported by Haynes Ambulance of Alabama, Inc. (“Haynes”), apparently to Troy Health. A form prepared by Haynes indicates that, at the time of Wilcoxon’s trans *1115 portation, Wilcoxon Wás “confused.” That same day, February 18, 2012, Wilcoxon was readmitted to Troy Health.
On February 24, 2012, Troy Health evaluated Wilcoxon and completed a form summarizing the findings of its evaluation of Wilcoxon titled “Minimum Data Set (MDS) — Version 3.0” (“the first MDS form”). The first MDS form reflects the results of assessments performed by Troy Health employees of Wilcoxon’s hearing, speech, vision, cognitive patterns, mood, behavior, and functional status, along with other areas of Wilcoxon’s health. The “Hearing, Speech, Vision” s'eetion of the first MDS form states, in part:'
“Makes self understood 1. Usually understood — difficulty communicating some words or finishing thoughts but is-able if prompted or given time[.]
“Ability to understand others 1. Usually understands — misses some part/intent of message but comprehends most conversation.”
The “Cognitive Patterns” section of the first MDS form states, in part:
“BIMS:[3] should resident interview be conducted 1. Yes
“BIMS res interview: repetition. of three words 3. Three
“BIMS res interview: able to report correct year 0. Missed by > 5 years ¡or no answer
“BIMS res interview: able to report correct month Missed by > 1 month or no answer
“BIMS res interview: can report' correct dayof week -1. Correct
“BIMS res interview: able to recall ‘sock’ 1, Yes, after cueing (‘something to wear’) .
'“BIMS res interview: able to recall ‘blue’ X. Yes, after cueing (‘a color’)
“BIMS res interview: able to recall ‘bed- 1. Yes, after cueing (‘a piece of furniture’)
“BIMS res interview: summary score 7
“Staff asmt mental status: conduct asmt 0. No (resident was able to complete interview)
“Signs of delirium: inattention 0. Behavior not present
“Signs of delirium: disorganized thinking 0. Behavior not present .
“Sighs of delirium: altered level of consciousness 0. Behavior not present
“Signs of delirium: psychomotor re- • tardation 0. Behavior not present
“Acute onset‘mental status change 0. No”
On March 2, 2012, Troy Health evaluated Wilcoxon again and completed another MDS form summarizing its evaluation of Wilcoxon (“the second MDS form”). The results on the second MDS form are identical to the results on the first MDS form set out above, except that the second MDS form' states “BIMS res interview: can report correct day of week 0. Incorrect or no answer” and “1. Ability to understand others 0. Understands — clear comprehension.”
On March 8, 2012, Margaret Mashburn, one of Wilcoxon’s daughters, filed a “Petition for Protective Services” in the circuit *1116 court, seeking an order preserving Wilcox-on’s assets. In the petition, Mashburn alleged that Bean was acting against Wil-coxon’s interests and was exploiting him by admitting Wilcoxon to Troy Health, by barring her communication with Wilcoxon, by transferring the title of Wilcoxpn’s truck to Bean, by selling, destroying, or removing Wilcoxon’s personal property from Wilcoxon’s house without benefit to Wilcoxon, and by altering the beneficiary to the proceeds of Wilcoxon’s life-insurance policy. It is undisputed that the circuit court entered two orders related to that petition. However, those orders are not in the record before this Court.[4]
On March 16, 2012, Troy Health evaluated Wilcoxon again and completed another MDS form summarizing its evaluation of Wilcoxon (“the third MDS form”). The results on the third MDS form are identical to the results on the first MDS form, except that the third MDS form states “BIMS res interview: can report correct day of week 0. Incorrect or no answer” and “BIMS res interview: able to recall ‘blue’ 1. Yes, no cue required.”
On March 23, 2012, Jon Adams, a physician’s assistant, completed a form titled “Troy Rehab Patient Summary” that summarized Wilcoxon’s condition at that time. Adams’s notes indicate that Wilcoxon was diagnosed with hypertension, altered mental status, “syncope and collapse;” history of alcoholism, alcohol-persistent dementia, lack of coordination, malaise, and fatigue, among other things. According to Adams’s notes, Adams’s assessment of Wilcoxon was hypertension and adult failure to thrive.
On April 9, 2012, Wilcoxon signed three documents. One document was titled “Revocation of Power of Attorney,” which purportedly revoked the August 12, 2012, power of attorney granted to Bean. That document was notarized. The notary’s certification states that
“before me a Notary Public personally appeared Garnell Wilcoxon, personally known to me (or proved to me on the basis of satisfactory evidence) to be the .person whose name is subscribed to the within instrument and acknowledged, to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person executed the instrument.”
The-second document was titled “Durable General Power of Attorney.” That document purportedly authorized Mash-burn to “act in, manage, and conduct all [of Wilcoxon’s] affairs.” That document was notarized and signed by two witnesses. The notary’s certification attached to that document states that
“[Wilcoxon] appeared before me this day ... and being first duly sworn, executed said instrument after the contents thereof had been read and duly explained to him, and acknowledged that the execution of said instrument by [him]self was his free and voluntary act and deed for the uses and purposes therein set forth, and the facts stated therein are true.”
The third document was titled “Durable Health Care Power of Attorney.” That document purportedly granted Mashburn the power to act as Wilcoxon’s attorney-in-fact in making “health care and related personal decisions for [Wilcoxon] as authorized in this document.” The “Durable *1117 Health Care Power of Attorney” states that Wilcoxon was “in full control of [his] mental facilities and [understood] the contents of [the] document and the effect of this grant of powers to [his] agent”; it was signed by two witnesses, who attested, in part, that “[we] believe [Wilcoxon] to be of sound mind and able to make decisions of this kind.”
On April 17, 2012, Troy Health evaluated Wilcoxon again and completed another MDS'form summarizing the findings of its evaluation of Wilcoxon (“the fourth MDS form”). The fourth MDS form is identical to the third MDS form, except that the fourth MDS form states “BIMS res interview: able to recall ‘blue’ 1. Yes, after cueing (‘a color’).”
On April 18, 2012, Mashburn signed a document titled “Troy Health & Rehabilitation Center’s Dispute Resolution Agreement” (“the 2012 arbitration agreement”). The 2012 arbitration agreement states “that all claims, disputes, and controversies” between Wilcoxon and Troy Health “that would constitute a cause of action in a court of law” “shall be resolved by binding arbitration” and that “[Wilcoxon] and [Troy Health] acknowledge that [Troy Health] regularly engages in transactions involving interstate commerce and the services provided by [Troy Health] to [Wil-coxon] involve such interstate commerce.”
Wilcoxon continued to reside at the Troy Health facility until he died on June 6, 2012. Following Wilcoxon’s death, Brenda McFarland, another of Wilcoxon’s daughters, filed a complaint as the personal representative for Wilcoxon’s estate. McFarland’s April 28, 2013, complaint asserts the following claims: 1) medical malpractice; 2) negligence; 3) breach of contract; 4) negligent hiring, training, supervision, and retention; and 5) loss of consortium.
On May 24⅛ 2013, Troy Health filed an answer to Wilcoxon’s complaint. Troy Health asserted, in part, that McFarland’s claims were barred from being litigated in a court of law “by virtue of an arbitration agreement entered into between plaintiff and defendant.” On July 9, 2013, Troy Health filed a motion to compel arbitration. In that motion, Troy Health sought, in part, to “[compel] arbitration of all claims asserted by [McFarland] against Troy Health.” Troy Health argued that the 2012 arbitration agreement was enforceable because, it said, it was an agreement requiring arbitration, the transaction involved interstate commerce, and the agreement was signed by Mashburn on behalf of Wilcoxon as his attorney-in-fact.
On December 23, 2013, McFarland filed a response to Troy Health’s motion to compel arbitration. McFarland argued that “Wilcoxon did not have the mental capacity to enter into the contract with [Troy Health,] and he did not have the mental capacity to give legal authority to enter into contracts on his behalf with either Bean or Mashburn." According to McFarland, “[t]he medical records document that Wilcoxon was habitually and/or permanently incompetent.” Therefore, McFarland argued, both the 2011 arbitration agreement and the 2012 arbitration agreement were invalid. '
On December 30, 2013, Troy Health filed a reply to McFarland’s response. Troy Health argued that both the 2011 arbitration agreement and the 2012 arbitration agreement were-due to be enforced because, Troy Health argued, McFarland did not prove that Wilcoxon was incompetent to contract on May 20, 2011, and did not prove that Wilcoxon was incompetent to execute the durable power of attorney in favor of Mashburn on April 9, 2012.
On January 6, 2014, the circuit court conducted a hearing on Troy Health’s motion to compel arbitration. On September *1118 22, 2014, the circuit court denied- Troy Health’s motion to compel arbitration, stating:
“This cause comes before the- Court on [Troy Health’s] motion to compel arbitration. Counsel for the parties appeared and presented argument in support of their respective , positions. Having now considered the pleadings of the parties, the referenced .exhibits, the arguments and contentions of counsel and specifically the holding in SSC Montgomery Cedar Crest Operating Company, LLC v. Bolding, 130 So.3d 1194 (Ala.2013), [Troy Health’s] motion to compel arbitration is denied.”
Troy Health appealed.

Standard of Review

The standard of review of a ruling denying a motion to compel arbitration is well settled:
“‘“This Court reviews de novo the denial of a motion to compel arbitration. Parkway Dodge, Inc. v. Yarbrough, 779 So.2d 1205 (Ala.2000). A motion to compel .arbitration is analogous to a motion for a summary judgment. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that the contract evidences á transaction affecting interstate commerce. Id. ‘[A]fter a motion to compel arbitration has been made and supported, the burden is on the non- ■ movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.’ Jim Burke Automotive, Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala. 1995) (opinion on application for rehearing).” ’ ”
SSC Montgomery Cedar Crest Operating Co. v. Bolding, 130 So.3d 1194, 1196 (Ala. 2013) (quoting Elizabeth Homes, L.L.C. v. Gantt, 882 So.2d 313, 315 (Ala.2003)).

Discussion

Troy Health sets forth four arguments attempting to demonstrate that the circuit court’s decision to deny Troy Health’s motion to compel arbitration-was in error. Troy Health argues 1) that the 2011 arbitration agreement executed by Wilcoxon was due to be enforced; 2) that the 2012 arbitration agreement .executed by Mash-* burn on behalf of Wilcoxon was due to be enforced; 3) that the circuit, court improperly relied on Bolding, supra; and 4) .that Alabama statutes and public policy support compelling arbitration in this case. Troy Health’s brief, at pp. 26, 32, 39, 44. Troy Health’s arguments that the 2011 arbitration agreement and the 2012 arbitration agreement were due to be enforced are alternative, dispositive arguments: if either agreement was due to be enforced, Troy Health is entitled to relief. We find persuasive Troy Health’s argument that the 2012 arbitration agreement was due to be enforced.
Before the circuit court, McFarland did not dispute that the 2012 arbitration agreement is a “ ‘ “contract calling for arbitration” ’ ” that “ ‘ “evidences a transaction affecting interstate commerce.” ’ ” Bolding, 130 So.3d at 1196. Instead, as set out above, McFarland argued that Wil-coxon was mentally incompetent when he executed the April 9, 2012, durable power of attorney in favor of Mashburn and that, therefore, the 2012 arbitration agreement, executed by Mashburn as Wilcoxon’s attorney-in-fact, was’invalid. McFarland raises that same argument before this Court, and, as before, does not dispute that the 2012 arbitration agreement is a ““‘contract calling for arbitration” ’ ” that “ ‘ “evidences a. transaction affecting interstate commerce.” ’ ” Thus, before this Court, the *1119 only issue concerning the enforceability of the 2012 arbitration agreement is whether Wilcoxon was mentally competent when he executed the April 9, 2012, durable power of attorney in favor of Mashburn.
“[T]he standard for determining whether a person is competent to execute a power of attorney is whether that person is able to understand and comprehend his or her actions. Queen v. Belcher, 888 So.2d 472, 477 (Ala.2003). The burden initially falls on the party claiming that the person who executed the power of attorney was incompetent when he or she executed the power of attorney. Id. If, however, it is proven that the person who executed the power of attorney was habitually or permanently incompetent before executing the power of attorney, the burden shifts to the other party to show that the power of attorney was executed during a lucid interval. Id.”
Yates v. Rathbun, 984 So.2d 1189, 1195 (Ala.Civ.App.2007).
Troy Health argues that McFarland, the party who claims that Wilcoxon was mentally incompetent to execute the power of attorney, failed to prove that Wilcoxon was not mentally competent when he executed the April 9, 2012, durable power of attorney appointing Mashburn as his attorney-in-fact. Additionally, Troy Health argues that McFarland failed to prove that Wil-coxon was “permanently incompetent” in the time before Wilcoxon executed the April 9, 2012, durable power of attorney. We agree with both of Troy Health’s arguments.
We first address Troy Health’s argument that McFarland failed to prove that Wilcoxon was not mentally competent when he executed the April 9, 2012, durable power of attorney. “The presumption is. that every person is sane, until the contrary is proven.” Thomas v. Neal, 600 So.2d 1000, 1001 (Ala.1992) (citing Hardee v. Hardee, 265 Ala. 669, 93 So.2d 127 (1956)). Additionally, “ * “proof of insanity at intervals or of a temporary character would create no presumption that it continued up to the execution of the instrument,' and the burden would be upon the attacking party to show insanity at the very time of the transaction.” ’ ” Wilson v. Wehunt, 631 So.2d 991, 996 (Ala.1994) (quoting Hall v. Britton, 216 Ala. 265, 267, 113 So. 238, 239 (1927)(emphasis added)).
In the present case, there are no facts demonstrating that Wilcoxon was not mentally competent “at the very time” he executed the April 9, 2012, power of attorney. Instead, there are facts indicating the opposite. As set out above, on April 9, 2012, Wilcoxon also executed a durable health-care power of attorney, which states that Wilcoxon; was “in full control of [his] mental facilities, and [that Wilcoxon understood] the contents of [the] document and the effect of this grant of powers to [his] agent.” The durable health-care power of attorney was also signed by two witnesses, who attested, in part, that “[we] believe [Wilcoxon] to be of sound mind and able to make decisions of this kind.”
We recognize that Wilcoxon was admitted to Troy Health through the signature of Bean, an “authorized representative,” that Wilcoxon was diagnosed with “altered mental status” and “alcohol persistent dementia,” and that, before April 9, 2012, three MDS forms concerning Wilcoxon had been completed, two of which indicated that he was unable to correctly state the year, the month, or the day of the week and one of which indicated that Wilcoxon was unable to correctly state the year and the month.[5]' Those general facts, however, *1120 are not facts concerning Wilcoxon’s mental competency “at the very time” he executed the April 9, 2012, power of attorney. Thus, because nothing in the record before this Court demonstrates that Wilcoxon was mentally incompetent at the time he executed the April 9, 2012, durable power of attorney in favor of Mashburn, we agree with Troy Health’s argument that McFarland, as the party challenging the power of attorney, failed to prove that Wilcoxon was not mentally competent when he executed the April 9, 2012, durable power of attorney.
Next, we consider Troy Health’s argument that McFarland failed to prove that Wilcoxon was “permanently incompetent” in the time before he executed the April 9, 2012, durable power of attorney. In response, McFarland argues that Wilcoxon’s diagnosis of “altered mental status” and “alcohol persistent dementia,” as'well as the three MDS evaluations conducted on Wilcoxon before April 9, 2012, evidenced habitual or permanent incompetence, such that the burden shifted to Troy Health to show that Wilcoxon executed the April 9, 2012, power of attorney during a lucid interval McFarland’s brief, at p. 30. McFarland’s argument is unpersuasive.
A diagnosis of dementia does not determine dispositively that a person is “permanently incompetent,” as that term is used to describe the mental incapacity necessary to justify the avoidance of a power of attorney. In Ex parte Chris Langley Timber & Management, Inc., 923 So.2d 1100 (Ala.2005), Clayton M. Reynolds was diagnosed with Alzheimer’s type dementia prior to executing certain timber deeds 'in favor of Chris Langley Timber and Management, Inc. (“Langley Timber”).[6] 923 So.2d at 1102. The trial court found that Reynolds lacked the mental capacity necessary to execute the timber deeds, and it entered a summary judgment setting aside the deeds. The Court of Civil Appeals affirmed the trial court’s judgment, but this Court reversed the Court of Civil Appeals’ judgment. This Court reasoned that the Court of Civil Appeals’ judgment was improper, in part because it impliedly held that Reynolds’s diagnosis of Alzheimer’s type dementia, without more, constituted “permanent insanity,” such that Reynolds lacked the mental capacity necessary to execute the timber deeds. This Court stated:
“The Court of Civil Appeals impliedly held that Reynolds’s Alzheimer’s disease constituted ‘permanent insanity’.... While it may be apparent that the dementia caused by Reynolds’s Alzheim *1121 er’s disease was ‘permanent’ in nature as distinguished from temporary, it is not so apparent that the state of Reynolds’s dementia constituted ‘insanity’ as that term is used to describe the mental incapacity necessary to justify the avoidance of a contract or a deed.
“To determine whether Reynolds’s dementia amounted to insanity so as to render the timber deeds void, the proper inquiry is whether the Alzheimer’s dementia permanently deprived Reynolds of ‘ “ ‘sufficient capacity to understand in a reasonable manner the nature and effect of ” ’ his signing the timber deeds. See Wilson [v. Wefmnt, 631 So.2d, 991, 996 (Ala.1994) ].”
923 So.2d at 1105-06.
In the present case, there is nothing in the record explaining the effects of “alcohol persistent dementia” and “altered mental status” on a person. There is nothing in the record indicating the effects of “alcohol persistent dementia” and “altered mental status” on Wilcoxon’s “capacity to understand in a reasonable manner the nature and effect of’ his actions. And there is nothing in the record indicating whether the effects of “alcohol persistent dementia” and “altered mental status” on Wilcoxon’s mental competency, if present, were permanently present in Wilcoxon or, instead, occurred “at intervals.” Even assuming, arguendo, that those diagnoses were permanent, this Court’s decision in Ex parte Chris Langley Timber indicates that Wilcoxon’s diagnoses would not dis-positively prove that Wilcoxon was “permanently incompetent,” as that term is used to describe the mental incapacity necessary to justify the avoidance of a grant of a power of attorney.[7] Thus, McFarland’s reliance on Wilcoxon’s diagnoses of “alcohol persistent dementia” and “altered mental status” to .demonstrate “permanent insanity,” without more, does not satisfy her burden under the applicable evidentia-ry standard.
Similarly, there is nothing in the record before this Court explaining the effects of a BIMS classification of “severely impaired” on Wilcoxon’s mental competency. We recognize that two of the three MDS forms completed before April 9, 2012, indicate that Wilcoxon was unable to correctly state the year, month, or day of the week and that one MDS form indicates that Wilcoxon was unable to correctly state the year or the month; however, those same forms also indicate that at that time Wil-coxon had clear speech, that he was usually able to make himself understood, that he was usually able to understand others, and that he did not have any signs of inattention) disorganized thinking, or an altered level of consciousness. Furthermore, McFarland does not direct this Court to any case demonstrating that Wil-coxon’s inability to correctly state the year, month, and day of the week constitutes permanent incompetence sufficient to shift the burden of proof to Troy Health to demonstrate that Wilcoxon executed the April 9, 2012, power of attorney during a lucid interval. Consequently, we agree with Troy Health’s argument that McFarland failed to demonstrate that Wilcoxon was incompetent. Accordingly, the burden remained on McFarland to demonstrate that Wilcoxon was mentally incompetent at the time he executed the April 9, 2012, durable power of attorney in favor of Mashburn. As detailed above, McFarland has failed to meet that burden.

Conclusion

Because McFarland failed to prove that Wilcoxon was mentally incompetent when *1122 he executed the. April 9, 2012, durable power of attorney, naming Mashbum as his attorney-in-fact and also failed to demonstrate that Wilcoxon was “permanently incompetent” before that date, and because there is no other issue concerning the validity of the. 2012 arbitration agreement, the 2012 arbitration agreement is due to be enforced. Thus, the circuit court’s decision denying Troy Health’s motion to compel arbitration was in error, and Troy Health is entitled to relief based on this ground'. Consequently, we reverse the-circuit court’s order and remand the case for proceedings consistent with this opinion. Our resolution of this issue pretermits discussion of Troy' Health’s other arguments.
. REVERSED AND REMANDED.
' STUART, MAIN, and WISE, JJ.,' concur.
BOLIN, MURDOCK, SHAW, and BRYAN, JJ., concur in the result.

. Troponin is ‘‘[a] globular protein of muscle that binds to tropomyosin and has considerable affinity for calcium ions; a central regulatory protein of muscle contraction." Steel-man’s Medical Dictionary 1880 (27th ed.2000).

. Hypomagnesemia is "[sjubnormal blood serum concentration of magnesium” that “may cause convulsions and concurrent hypocalce-mia.” Stedman’s Medical Dictionary 862 (27th ed.2000). ,

. According to Brenda McFarland, the personal representative of Wilcoxon’s estate, . “BIMS” stands for "Brief Interview for Mental Status.” In her brief, McFarland provides , the following explanation of the BIMS. scoring . ranger-
"The scoring range on the BIMS is from zero (0) to fifteen (15). Thirteen (13) to fifteen (15) is cognitively intact; eight (8) to twelve (12) is moderately impaired; and zero (0) to seven (7) is severe impairment.”
It is undisputed that a BIMS score of 7 reflects "severe impairment.”

. Troy Health attaches the circuit court’s orders to its brief before this Court, which we cannot consider. See Patterson v. Consolidated Aluminum Corp., 101 So.3d 743, 745 n. 5 (Ala.2012) ("[E]vidence attached to or otherwise described in an appellate brief but ’‘not made a part of the record on appeal’ is not properly before this Court. Spradlin v. Drummond, Inc., 548 So.2d 1002, 1005 (Ala. 1989).”).

. Concerning the MDS forms, McFarland also argues that "on simple questions for any *1120 adult, specifically, what is a sock, what is the color blue and what is a bed, Wilcoxon could not answer the questions without being cued.” However, there is nothing before this Court explaining what questions Troy Health employees asked Wilcoxon while completing the MDS forms. Additionally, the first and second MDS forms merely state:
"BIMS res interview: able to recall ‘sock’ 1. Yes, after cueing (’something to wear’)
"BIMS res interview: able to recall ‘blue’ 1. Yes, after cueing (‘a color’)
“BIMS res interview: able to recall ‘bed’ 1. Yes, after cueing (‘a piece of furniture’).”
Thus, nothing in the record before this Court supports McFarland’s assertion that . Wilcoxon was asked "what is a sock, what is the color blue, and what is á bed” and could not answer without being cued. Accordingly, the import of that assertion need not be addressed-further.

. The mental capacity required to execute an inter vivos conveyance of property, such as a timber deed, is the same as that required to grant a power of attorney. Queen v. Belcher, 888 So.2d 472, 477 (Ala.2003) (“A trust agreement is an inter vivos conveyance of property, and is, therefore, subject to the standard governing conveyances_ This . same higher standard has also been applied to powers of attorney. See Morris v. Jackson, 733 So.2d 897 (Ala.Civ.App. 1999).”).

. McFarland attempts to factually distinguish the present case from Ex parte Chris Langley Timber. McFarland’s brief, at p. 23. However, McFarland does not dispute that the general rule from Ex parte Chris Langley Timber applies to the present case.