Rel: May 12, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2022-2023

———————————————

## SC-2022-0828

———————————————

## Alabama Somerby, LLC, d/b/a Brookdale University Park IL/AL/MC; Brookdale Senior Living, Inc.; and Undrea Wright

## v.

## L.D., as next friend of E.D.

## Appeal from Jefferson Circuit Court
## (CV-22-900852)

SHAW, Justice.

Alabama Somerby, LLC, d/b/a Brookdale University Park

IL/AL/MC; Brookdale Senior Living, Inc.; and Undrea Wright, who are

defendants in the action below, appeal from the Jefferson Circuit Court's order denying their motion to compel arbitration of the claims asserted against them by the plaintiff, L.D., as the next friend of her mother, E.D.[1] We reverse and remand.

Facts and Procedural History

Alabama Somerby and Brookdale Senior Living (collectively referred to as "Brookdale") operate an assisted-living facility for seniors ("the nursing home") in Jefferson County; Wright is the administrator of the nursing home.

In December 2016, E.D. executed in Illinois both a durable "Power of Attorney for Property" ("the property POA") and a "Power of Attorney for Health Care" ("the health-care POA"). The property POA specifically named E.D.'s daughter, C.C., as E.D.'s agent and attorney-in-fact authorized to make decisions on E.D.'s behalf with respect to broad categories of personal business, including transactions, claims, and

_____

[1]For purposes of this appeal, the Court, pursuant to Rule 52, Ala. R. App. P., has used initials when referring to certain individuals to protect the anonymity of E.D., who is alleged to be the victim of sex offenses.

litigation. It also included a specific authorization for "Estate and Long Term Care Planning" that authorized C.C. as follows:

> "Caregiver Agreements. I authorize my agent to enter into, execute, modify, alter or amend any contract agreement (for example, a Caregiver Agreement or Personal Services Contract) pertaining to my medical, personal or general care that I may require at my residence, assisted living facility, nursing facility, or in another's residence on my behalf."

(Emphasis added.) The property POA further provided both that it would become "effective on the date [E.D.'s designated agent] determines that [E.D. is] unable to give prompt and intelligent consideration to financial decisions" and that any "such determination shall be made only with the concurring opinion of a physician who ha[s] examined or treated [E.D.] within the last three months of rendering such an opinion."

The health-care POA similarly designated C.C. as E.D.'s "health care agent" with, among other powers, the authority to make health-related decisions, including "agreeing to admit [E.D.] to or discharge [her] from any hospital, home, or other institution." Pursuant to the health-care POA, L.D., E.D.'s other daughter, was named as an optional successor in the event that C.C. "is unable or does not want to make health care decisions for [E.D.]." The health-care POA further provided that "[o]nly one person at a time [could] serve as [E.D.'s] agent." Like the

3

property POA, it expressed E.D.'s desire that C.C. become her health-care agent and "[m]ake decisions for [E.D.] only when [E.D. could not] make them for [herself]" and further specified:

> "The physician(s) taking care of [E.D.] will determine when [she lacks] this ability. Starting now, for the purpose of assisting … with … health care plans and decisions, [C.C.] shall have complete access to my medical and mental health records, the authority to share them with others as needed, and the complete ability to communicate with [E.D.'s] personal physician(s) and other health care providers, including the ability to require an opinion of [E.D.'s] physician as to whether [E.D. lacks] the ability to make decisions for [herself]."

It appears undisputed that E.D. was competent at the time these powers of attorney were executed.[2]

On January 19, 2021, C.C. executed a "Transfer of Health Care Power of Attorney" ("the transfer POA"), purporting to transfer the health-care POA to L.D.:

> "Pursuant to the Health Care Power of Attorney signed by [E.D.] on December 14, 2016, I, [C.C.], am the appointed health care agent for [E.D.]. Effective January 30, 2021, I voluntarily relinquish my position as health care agent for

_____

[2]Although, in her brief on appeal, L.D. suggests that the health-care POA also designated C.C. as E.D.'s legal guardian, the document instead merely indicated E.D.'s preference that C.C. be named as her guardian "[i]f a guardian of [her] person is to be appointed." There is nothing in the record before us indicating that actual proceedings to establish legal guardianship over E.D. were ever initiated in either Illinois or Alabama.

4

[E.D.] and transfer this authority to the successor agent [L.D.] as directed by the above referenced Health Care Power of Attorney. This transfer of authority is effective until such time as [L.D.] is no longer able or willing to act as health care agent for [E.D.], at which time the authority will revert back to me and I will resume the position as health care agent for [E.D.]."

In July 2021, then 81-year-old E.D., who had, by that time, purportedly been diagnosed as suffering generally from "dementia," was admitted to the nursing home. In connection with E.D.'s admission, Brookdale was provided, as part of its routine business practices in such circumstances, copies of the property POA, the health-care POA, and the transfer POA. Also at that time, C.C. executed all admission-related documentation on E.D.'s behalf, including, among others, a "Residency Agreement" ("the residency agreement") that contained an "Agreement to Arbitrate" ("the arbitration provision") providing, in pertinent part:

"1. Any and all claims or controversies arising out of, or in any way relating to, this [Residency] Agreement or any of your stays at [the nursing home], excluding any action for involuntary transfer or discharge or eviction, and including disputes regarding interpretation, scope, enforceability, unconscionability, waiver, preemption and/or violability of this [Residency] Agreement, whether arising out of Local, State or Federal law, whether existing or arising in the future, whether for statutory, compensatory or punitive damages and whether sounding in breach of contract, tort or breach of statutory duties, or otherwise, irrespective of the basis for the duty or the legal theories upon which the claim is asserted, shall be

submitted to binding individual arbitration … and shall not be filed in a court of law. The parties to this [Residency] Agreement further understand that a judge and/or jury will not decide their case.

"2. The parties hereby expressly agree that this Arbitration Provision, the Residency Agreement and the Resident's stays at [the nursing home] substantially involve interstate commerce, and stipulate that the Federal Arbitration Act ('FAA') shall exclusively apply to the interpretation and enforcement of this [Residency] Agreement, and shall preempt any inconsistent State law and shall not be reverse preempted by the McCarran-Ferguson Act; United States Code Title 15, Chapter 20, or other law. Any party who demands arbitration must do so for all claims or controversies that are known, or reasonably should have been known, by the date of the demand for arbitration, and if learned of during the course of the arbitration proceeding, shall amend the claims or controversies to reflect the same. All current damages and reasonably foreseeable damages arising out of such claims or controversies shall also be incorporated into the initial demand or amendment thereto. Except as otherwise stated explicitly herein, this Arbitration Provision is entered into pursuant to, is governed by, and must be interpreted and enforced under the [FAA]."

(Emphasis omitted.)

C.C. executed the residency agreement as E.D.'s "Legal Representative" and referenced, as the supporting "legal authority" on which she relied in doing so, a "Financial Power of Attorney." A "Resident Move-In Record and Agreement" contemporaneously executed by C.C. as

6

E.D.'s "Legal Representative and … Financially Responsible Party," as well as E.D.'s "daughter [and] POA," also identified L.D. as E.D.'s "daughter [and] healthcare POA." That same form identified, as reported by C.C., the sole "medical reason" that E.D. herself was "physically unable" to sign the admission documentation as "dementia."

In March 2022, L.D. filed on E.D.'s behalf, in the Jefferson Circuit Court, a complaint against Brookdale and Wright ("the Brookdale defendants") and others, asserting various tort claims and seeking related damages premised on allegations that, following her admission to the nursing home, E.D. had been subjected to multiple sexual assaults both by other residents and by an employee of Brookdale. The complaint, which specifically alleged that E.D. was "legally incompetent" and "lacked mental capacity to consent to any sexual conduct," included the following footnote and accompanying citation to decisions from this Court on the doctrine of apparent authority:

> "[Brookdale] has an arbitration agreement that was signed by a daughter that had relinquished her rights as … [E.D.'s] healthcare power of attorney six (6) months prior to executing the agreement. [Brookdale] was aware that the individual had relinquished her rights and failed to have the proper healthcare power of attorney sign their agreement, which makes the agreement unenforceable. In order to enforce

7

an arbitration clause a party must have the signature of someone with a legal authority to act on their behalf for healthcare."

In addition to filing responsive pleadings, the Brookdale defendants jointly moved to compel arbitration of L.D.'s claims against them or, alternatively, to dismiss the action without prejudice to allow those claims to proceed via arbitration. Citing the fact that the residency agreement containing the arbitration provision implicated interstate commerce and specifically referencing the property POA, the Brookdale defendants argued that C.C. explicitly had been granted authority to handle claims, litigation, or arbitration and/or to enter into contracts for medical or personal care on E.D.'s behalf, specifically including "'caregiver agreements.'" The motion further alleged that, during the admission process and as required by the admission documentation, a copy of the property POA and the transfer POA had been presented to Brookdale as authorizing C.C. to act for E.D. and that C.C. had signed all admission agreements as the authorized legal representative of E.D. Thus, according to the Brookdale defendants, the arbitration provision was both valid and enforceable with respect to L.D.'s claims.

Their motion was accompanied by, among other exhibits including

8

the residency agreement, the affidavit testimony of Tara Bailey, Brookdale's marketing director, who attested to the following: "Based on documentation and information provided to Brookdale by [E.D.'s] family, [C.C.] … was designated to Brookdale as the person with the legal authority to sign documents on [E.D.'s] behalf." Bailey's affidavit specifically referenced several places in the admission documents where C.C. was designated as E.D.'s "'Legal Rep,' 'Guarantor,' and 'daughter/POA.'" She further noted that E.D.'s removal from the nursing home in September 2021 was effected by means of a letter from C.C. as "'POA for [E.D.]'" canceling the residency agreement on E.D.'s behalf. Copies of those documents were attached as exhibits to Bailey's affidavit.

L.D. subsequently filed a response opposing the motion to dismiss or to compel arbitration. In that response, she did not appear to dispute either that a contract calling for arbitration existed, as the Brookdale defendants alleged, or that that contract implicated interstate commerce. She instead asserted that the arbitration provision was, under these facts, unenforceable to the extent that C.C. purportedly had entered into the agreement to arbitrate with a "healthcare provider" on E.D.'s behalf when, according to L.D., she was E.D.'s sole attorney-in-fact for health-

9

care purposes under the health-care POA and transfer POA. L.D. further asserted that, as a result of her dementia, E.D. was not competent on the date the residency agreement containing the arbitration provision was executed. L.D.'s response included no accompanying medical evidence on the issue of E.D.'s competency in July 2021, when the residency agreement was executed.

In further filings on the issue, the Brookdale defendants continued to maintain that C.C. had had explicit authority under the property POA to bind E.D. but contended, alternatively, that, even assuming that C.C. had lacked actual authority, which they disputed, the arbitration provision was nonetheless enforceable under the doctrine of apparent authority. As to apparent authority, the Brookdale defendants further asserted that L.D. had made no evidentiary showing demonstrating that E.D. was legally incompetent at the time of her admission to the nursing home. They further noted that, with respect to all of the treatment E.D. had received at the nursing home, C.C. had "specifically held herself out as her mother's legal representative" and had provided documentation supporting that she was E.D.'s legal representative.

The trial court, following a hearing,[3] denied the motion seeking to dismiss the action or to compel arbitration. The Brookdale defendants timely appealed, asserting that the trial court had erred by failing to order arbitration. See Rule 4(d), Ala. R. App. P. Thereafter, L.D. unsuccessfully sought to supplement the record from the trial court to add affidavit testimony from E.D.'s treating physician aimed at establishing E.D.'s incompetency as of July 2021.

### Standard of Review

"'"[T]he standard of review of a trial court's ruling on a motion to compel arbitration at the instance of either party is a de novo determination of whether the trial judge erred on a factual or legal issue to the substantial prejudice of the party seeking review." Ex parte Roberson, 749 So. 2d 441, 446 (Ala. 1999). Furthermore:

"'"A motion to compel arbitration is analogous to a motion for summary judgment. TranSouth Fin. Corp. v. Bell, 739 So. 2d 1110, 1114 (Ala. 1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that that contract evidences a transaction

---

[3]A transcript of the hearing was not included with the record on appeal.

11

> affecting interstate commerce.  <u>Id.</u>
> 'After a motion to compel arbitration
> has been made and supported, the
> burden is on the non-movant to present
> evidence that the supposed arbitration
> agreement is not valid or does not apply
> to the dispute in question.'"
>
> "'<u>Fleetwood Enters., Inc. v. Bruno</u>, 784 So. 2d 277,
> 280 (Ala. 2000) (quoting <u>Jim Burke Auto., Inc. v.</u>
> <u>Beavers</u>, 674 So. 2d 1260, 1265 n.1 (Ala. 1995)
> (emphasis omitted)).'
>
> "<u>Vann v. First Cmty. Credit Corp.</u>, 834 So. 2d 751, 752-53
> (Ala. 2002)."

<u>Elizabeth Homes, L.L.C. v. Cato</u>, 968 So. 2d 1, 3 (Ala. 2007).

## Discussion

Citing principles of both actual and apparent authority, the Brookdale defendants contend on appeal that the trial court erred in denying their motion seeking to compel the parties to arbitrate.  The parties dispute, as they did below, whether the property POA allowed C.C. to act as E.D.'s attorney-in-fact for purposes of executing the residency agreement or whether L.D. instead possessed that authority under the health-care POA.  We pretermit discussion of C.C.'s actual authority because we conclude that, as the Brookdale defendants have argued below and on appeal, C.C. clearly had apparent authority to

execute the residency agreement and thus bound E.D. to the arbitration provision.[4]

Here, C.C. executed all the documents required to admit E.D. to the nursing home in a representative capacity on E.D.'s behalf. In doing so, C.C. identified herself as E.D.'s legal representative and, for all that appeared, was fully authorized by E.D. to act, under the circumstances, on E.D.'s behalf. E.D. accepted the benefits of Brookdale's services under the residency agreement without objection. As the Brookdale defendants note, this Court, in Tennessee Health Management, Inc. v. Johnson, 49 So. 3d 175 (Ala. 2010), considered the enforceability of an arbitration agreement under comparable circumstances. Specifically, in Johnson, the resident's daughter similarly signed all the documents required to

---

[4]There is no evidence before us indicating that, by their terms, either power of attorney became effective. Specifically, L.D. provided no evidence indicating that a physician had rendered the necessary opinion or determination regarding E.D.'s mental condition that would have triggered either the property POA or the health-care POA. If the powers of attorney were in fact effective, then it is clear that, although the health-care POA allowed E.D.'s health-care agent to make the medical decision to obtain treatment for E.D. at a hospital, nursing home, or other institution, the property POA gave C.C., at the time the residency agreement was executed, the power to enter into and execute a contract with an assisted-living or nursing-home facility to provide such treatment.

admit the resident to the defendant nursing home -- including an agreement to arbitrate -- in various purported representative capacities, including as the "family member responsible for the resident" and as the resident's "'Legal representative.'" 49 So. 3d at 176-77. When a dispute subsequently arose between the personal representative of the resident's estate and the defendant nursing home, the defendant nursing home, relying on the documents executed by the daughter on the resident's behalf, moved to compel arbitration. The personal representative opposed that request on the grounds that the daughter had lacked a power of attorney providing her authority to act on the resident's behalf, that the daughter had signed all the admission documents in her personal capacity, and that the resident neither had signed anything nor had instructed the daughter to do so. Id. at 177-78.

In the ensuing appeal from the trial court's order refusing to enforce the arbitration agreement, this Court, in Johnson, explained:

> "Because [the resident] enjoyed the ease of checking into [the defendant nursing home] without the requirement that she sign anything, under circumstances in which no reasonable person could consider the admission possible without the intervention of an agent to act on [her] behalf, she thereby passively permitted [her daughter] … to appear to [the defendant nursing home] to have the authority to act on her behalf, and [the daughter's] apparent authority is, therefore,

14

implied. See <u>Carraway [v. Beverly Enters. Alabama, Inc.,]</u> 978 So. 2d [27] at 30 [(Ala. 2007)] ('Apparent authority "is implied where the principal passively permits the agent to appear to a third person to have the authority to act on [her] behalf."' (quoting <u>Treadwell Ford, Inc. v. Courtesy Auto Brokers, Inc.</u>, 426 So. 2d 859, 861 (Ala. Civ. App. 1983)))).

"[The personal representative of the resident's estate] relies upon the fact that [the resident] did not instruct [the daughter] to sign the admission documents on her behalf. Notwithstanding the absence of evidence indicating that [the resident] instructed [her daughter] to sign the admission documents on her behalf, there is no evidence indicating that upon entering [the defendant nursing home] or any time after her admission [the resident] ever signed any document obligating herself to pay for the services, that she ever objected to [her daughter's] having signed the admission documents, or that she understood that [the defendant nursing home] was treating her without charge, dispensing with the necessity for an agreement. Instead, [the resident] remained at [the defendant nursing home] …, accepting the benefits of the services rendered without objection or question. As was the case in <u>Carraway</u>, '[t]here is no evidence indicating that [the resident] had any objection to [her daughter's] acting on her behalf in admitting [the resident] to the nursing home.' 978 So. 2d at 31.

"[The personal representative] also argues that [the resident] is not bound by the [arbitration] agreement because she did not sign it and she was not present when [her daughter] signed it. [The daughter's] claims, if any, may be subject to arbitration, [the personal representative] argues, but as a nonsignatory to the agreement, [the resident] could not be forced to arbitrate her claims. [The personal representative] relies upon <u>Noland Health Services, Inc. v. Wright</u>, 971 So. 2d 681 (Ala. 2007). In <u>Noland</u>, a plurality of this Court held that a daughter-in-law's signature as the responsible party on a nursing-home arbitration agreement

was ineffective to bind the resident to the agreement. <u>Noland</u> is distinguishable from this case, however, because the nursing-home resident in <u>Noland</u> was mentally incompetent and could not authorize anyone to act on her behalf and because the daughter-in-law did not sign any document in the capacity of her mother-in-law's legal representative.

"[The personal representative] also argues that [the daughter] did not have a power of attorney over [the resident] or any other legal authority to contractually bind [the resident] to the [arbitration] agreement. In <u>Carraway</u>, [the resident] executed a power of attorney a few weeks after she was admitted to the nursing home that gave [her brother] further authority to act on her behalf. The Court found that her execution of the power of attorney was further evidence suggesting that [the resident] approved of her brother's acting on her behalf when he signed the admission documents. 978 So. 2d at 31. The arbitration agreement in <u>Carraway</u> did not call for the signature of a legal representative; likewise, the [arbitration] agreement [the daughter] executed did not require the signature of [the resident's] legal representative. The absence of a power of attorney in this case is not fatal to our conclusion that [the daughter] had the apparent authority to bind [the resident] at the time [the daughter] signed the admission documents in view of the evidence indicating that [the resident] passively permitted [her daughter] to act on her behalf.

"Under these circumstances, [the defendant nursing home] proved the existence of a valid contract calling for arbitration and proved that the contract evidenced a transaction affecting interstate commerce. The trial court erred in denying the motion to compel arbitration."

49 So. 3d at 180-81. <u>Johnson</u> clearly controls our decision in the present case.

16

L.D., however, disputes the possibility of apparent authority attaching to C.C.'s actions because, she contends, "[t]he evidence is clear that [E.D.] could not make decisions on her own [as of her admission date and, thus, could not] provide any sort of apparent authority" to C.C. L.D.'s brief at 27. Contrary to that assertion, we see nothing establishing either E.D.'s incompetency or that she objected at any time to C.C.'s having executed the residential agreement on her behalf.

> "Before determining whether [the resident's family member] had the apparent authority to execute the agreement, the Court must decide whether [the resident], on whose behalf the agreement was signed, was mentally competent at the time [the family member] signed the agreement. [The defendant nursing home] argues that [the plaintiff] has not met her burden of proving [the resident's] incapacity. Specifically, [the defendant nursing home] argues that [the plaintiff] has failed to demonstrate that [the resident's] advanced age and dementia resulted in anything more than short-term memory loss.

> "In Troy Health & Rehabilitation Center v. McFarland, 187 So. 3d 1112 (Ala. 2015), this Court discussed the enforceability of an arbitration agreement and whether a nursing-home resident was mentally competent when he executed a durable power of attorney naming his nephew as his attorney-in-fact. We find the following reasoning from that case to be analogous:

>> "'"[T]he standard for determining whether a person is competent to execute a power of attorney is whether that person is able to understand and

comprehend his or her actions. Queen v. Belcher, 888 So. 2d 472, 477 (Ala. 2003). The burden initially falls on the party claiming that the person who executed the power of attorney was incompetent when he or she executed the power of attorney. Id. If, however, it is proven that the person who executed the power of attorney was habitually or permanently incompetent before executing the power of attorney, the burden shifts to the other party to show that the power of attorney was executed during a lucid interval. Id."

"'Yates v. Rathbun, 984 So. 2d 1189, 1195 (Ala. Civ. App. 2007).'

"187 So. 3d at 1119.

"We held that the presumption is that every person has the capacity to understand until the contrary is proven. McFarland, 187 So. 3d at 1119 (citing Yates v. Rathbun, 984 So. 2d 1189, 1195 (Ala. Civ. App. 2007), Thomas v. Neal, 600 So. 2d 1000, 1001 (Ala. 1992), and Hardee v. Hardee, 265 Ala. 669, 93 So. 2d 127 (1956)). The Court differentiated between the burden of proving permanent incapacity and temporary incapacity. Specifically, we held that proof of incapacity

"'"'"at intervals or of a temporary character would create no presumption that it continued up to the execution of the instrument, and the burden would be upon the attacking party to show [incapacity] at the very time of the transaction."'" Wilson v. Wehunt, 631 So. 2d 991, 996 (Ala. 1994) (quoting Hall v. Britton, 216 Ala. 265, 267, 113 So. 238, 239 (1927) (emphasis added)).'

18

"McFarland, 187 So. 3d at 1119.

"Thus, a party seeking to avoid a contract based on the defense of incapacity must prove either permanent incapacity or contractual incapacity at the very time of contracting. See Ex parte Chris Langley Timber & Mgmt., Inc., 923 So. 2d 1100, 1106 (Ala. 2005). The party seeking to avoid the contract bears the burden of proving incapacity to contract by a preponderance of the evidence. See Hester v. Hester, 474 So. 2d 734, 736 (Ala. Civ. App. 1985).

"This Court recognizes that [the resident's] diagnosis of dementia, by itself, does not establish permanent incapacity. McFarland, 187 So. 3d at 1120 (citing Ex parte Chris Langley Timber, 923 So. 2d at 1106). Although it may be apparent that [the resident's] dementia was chronic in nature as distinguished from temporary, it is not so apparent that the state of [his] dementia constituted 'permanent incapacity' as that term is used to describe the mental incapacity necessary to justify the avoidance of the arbitration provision. See Ex parte Chris Langley Timber, 923 So. 2d at 1106. The Court is unable to discern from the medical records whether [the resident's] mental-health condition had progressed to the level of 'permanent incapacity' by the time he was admitted …. [Physician's] notes indicate that [the resident's] dementia caused no more than short-term memory loss. … [H]owever, the record also indicates that [the resident's] condition was 'slowly progressive' and that he was able to follow commands and sometimes converse with the physician. Thus, this Court cannot conclude that [the plaintiff] has overcome her burden of proving that [the resident's] condition rose to the level of permanent incapacity as that term is used under the law to void a contract.

"The more important question is whether [the plaintiff] has overcome her burden of demonstrating contractual incapacity '"'"at the very time of the transaction."'"' McFarland, 187 So. 3d at 1119 (quoting Wilson v. Wehunt,

631 So. 2d 991, 996 (Ala. 1994), quoting in turn <u>Hall v. Britton</u>, 216 Ala. 265, 267, 113 So. 238, 239 (1927))."

<u>Stephan v. Millennium Nursing & Rehab Ctr., Inc.</u>, 279 So. 3d 532, 539-41 (Ala. 2018) (footnote omitted; initial emphasis added). Accordingly, under Alabama law generally, only incompetent, nonsignatory nursing-home residents lack the capacity to authorize anyone to act on their behalf and are not bound by arbitration agreements executed by the resident's representative. See <u>id.</u> See also <u>Kindred Nursing Ctrs. E., LLC v. Jones</u>, 201 So. 3d 1146, 1153 (Ala. 2016).

In the present case, the Brookdale defendants established that an agreement providing for arbitration exists and that the agreement affected interstate commerce. See <u>Elizabeth Homes</u>, supra. The burden shifted to L.D. to counter with evidence demonstrating that arbitration provision was either invalid or inapplicable to the parties' dispute.

In her response opposing enforcement of the arbitration provision, L.D. made only unsupported representations that E.D. was not competent in 2021. Notably, despite allegedly holding E.D.'s health-care POA and having "complete access to [E.D.'s] medical and mental health records," L.D. presented no medical evidence demonstrating E.D.'s legal incompetency -- or even any explanation of E.D.'s symptoms or anecdotes

20

evidencing her purported deteriorated mental state. This contrasts with Stephan, supra, in which the Court ultimately held that the plaintiff had adduced sufficient evidence establishing the resident's incompetency, including affidavit testimony relaying accounts of the resident's confusion, loss of cognition, and lack of comprehension; medical records indicating the resident's inability to converse with medical personnel regarding the circumstances of his care; and evidence indicating the resident's potential mental impairment following a major surgery. Id. at 541.

We do note, as L.D. argues, that a diagnosis of dementia, at the very least, may suggest intervals of mental incompetency that might render a resident incapable of bestowing authority to act on the resident's behalf or of ratifying such actions. In the present case, however, the record contains no evidence demonstrating anything other than an unsubstantiated, informal diagnosis that E.D. was suffering from generalized "dementia and cognitive issues" and a corresponding request that, following admission to the nursing home, E.D. be housed in the "memory care" unit as opposed to the "assisted living" portion of the nursing home. See Troy Health & Rehab. Ctr. v. McFarland, 187 So. 3d

21

1112, 1119 (Ala. 2015) (plurality opinion) ("'The presumption is that every person is sane, until the contrary is proven.' … Additionally, '"'proof of insanity at intervals or of a temporary character would create no presumption that it continued up to the execution of the instrument, and the burden would be upon the attacking party to show insanity <u>at the very time of the transaction</u>.'"'" (citations omitted)). <u>Cf. TitleMax of Alabama, Inc. v. Falligant</u>, 328 So. 3d 244, 255 (Ala. 2020) (plurality opinion) ("[E]vidence indicating that [an individual] suffers from an undefined mental illness, that she lacks the ability to manage her financial affairs, and that she did not understand the terms of the contracts is not sufficient evidence to create a genuine question of fact as to whether she is permanently incapacitated and, thus, unable to contract."). Thus, L.D. failed to establish that E.D. did not -- or could not -- understand that she was, in acquiescing without objection to C.C.'s actions, bestowing apparent authority.

Accordingly, because the trial court erred in denying the Brookdale defendants' request to compel arbitration, we reverse the trial court's order denying the motion to compel arbitration and remand the case for further proceedings consistent with this opinion.

22

REVERSED AND REMANDED.

Parker, C.J., and Bryan, Mendheim, and Mitchell, JJ., concur.