Howard Yates ("Howard") appeals from a judgment of the Mobile Probate Court appointing Julie Rathbun ("Julie") as guardian of Jane E. Yates ("Jane"). We affirm.
 Procedural History
On September 7, 2006, Julie filed in the probate court a petition for letters of guardianship and conservatorship for Jane. In her petition, she alleged that Jane was incapacitated, that she was Jane's step-daughter, and that she had been nominated as guardian and conservator in a "General Durable Power of Attorney" executed by Jane.
That same day, Howard also filed a petition for letters of guardianship and conservatorship for Jane. In his petition, he alleged that Jane was incapable of handling her own business affairs or taking care of her physical needs, that he was Jane's husband, and that he was providing constant care for Jane. *Page 1191 
On October 3, 2006, Julie filed a consent and waiver form in which Lois Phelan, Jane's sister, consented to the relief sought in Julie's petition. On November 27, 2006, the probate court appointed Sarah S. Frierson as guardian ad litem for Jane. The court also appointed Brenda Pierce as court representative, pursuant to Ala. Code 1975, § 26-2A-102(b), on December 11, 2006. Both the guardian ad litem and the court representative filed reports. The court representative recommended that "absent some definite showing of mental incompetence or physical incapacity, [Howard] should be allowed to continue to care for [Jane]"; the guardian ad litem stated that she had no firm opinion about who should be named guardian for Jane. On January 5, 2007, Lois Phelan withdrew her consent to the relief sought in Julie's petition.
On January 9, 2007, a hearing was held on both petitions. After the hearing, both parties filed briefs in support of their positions. On January 26, 2007, the court entered a judgment, stating:
 "This cause coming on to be heard in open Court, the Court having heard numerous witnesses in the matter of the two competing Petition's for Letters of Guardianship and Conservatorship of Jane E. Yates, the Court makes the following findings:
 "1. That the Alleged Incapacitated Jane E. Yates is incapacitated and that the appointment of a guardian is necessary and desirable as a means of providing continuing care and supervision of said Incapacitated;
 "2. That Petitioner Howard Yates has provided exemplary care for said Incapacitated;
 "3. That Petitioner Howard Yates has exhibited racing thoughts and agitated demeanor in expressing his desire to care for his wife, Jane E. Yates, and that he is apparently unable to make reasonable decisions as to his continued mental and physical health care; that if such activity continues, his health, mentally and physically[,] will in the mind of the Court, lead to a diminution in the level of care he can provide the Incapacitated;
 "4. That Petitioner Julie Rathbun has exhibited a measured, assured competence to provide the necessary needs of Incapacitated and has demonstrated the financial ability to satisfy the Court that necessary resources will be available to care for the Incapacitated, and, parenthetically for her father, Petitioner Howard Yates;
 "5. That each petition herein has been proffered and defended by accomplished, learned counsel and that the Court has been provided excellent briefs by each; and
 "6. That Section 26-2A-104(b)[, Ala. Code 1975,] provides that the named attorney-in-fact for an Incapacitated person is entitled to priority to be appointed as guardian.
 "NOW THEREFORE, the Court hereby Orders, Adjudges and Decrees that Petitioner Julie Rathbun is appointed as Guardian for Jane E. Yates, and the Court orders that the cost of this proceeding be divided and paid equally by each Petitioner."
On February 26, 2007, Howard filed a motion to alter, amend, or vacate the judgment, and Julie filed a response to Howard's motion on March 2, 2007. After a hearing, the probate court denied Howard's postjudgment motion on March 26, 2007. Howard filed his notice of appeal to the Alabama Supreme Court on May 7, 2007; that court transferred the appeal to this court, pursuant to Ala. Code 1975, § 12-2-7(6). *Page 1192 
 Standard of Review "[A] trial court's judgment based upon findings of fact made upon ore tenus testimony is presumed to be correct. CRW, Inc. v. Twin Lakes Property Owners Association, Inc., 521 So.2d 939 (Ala. 1988). This Court will not reverse such a judgment unless it is palpably wrong or manifestly unjust. CRW. We may not substitute our judgment for that of the trial court, and we will indulge all favorable presumptions to sustain that court's conclusion. CRW."
Garmon v. Williamson, 603 So.2d 968, 969 (Ala. 1992).
 Facts
Howard and Jane married in 1969. Howard had two children from a previous marriage, Robert Yates and Julie. About six months after Howard and Jane married, Jane suffered multiple aneurysms and strokes that resulted in Jane's being paralyzed on her right side and unable to speak. Since that time, Howard has been devoted to taking care of Jane. At the time Jane became disabled, she and Howard lived in Illinois; they continued to live there until 1990.
In 1990, Howard decided to move to Guadalajara, Mexico, because, when he and Jane needed to be provided with care, it was more affordable in Mexico to hire someone to provide that care. In 1992, Howard executed a power of attorney in favor of Julie; it appears that Jane also executed a durable power of attorney at the same time. The power of attorney executed by Jane provides, in pertinent part:
 "In the event court proceedings are hereafter commenced to appoint a guardian, conservator or other fiduciary to take charge of my person, or to manage and conserve my property, I hereby nominate and appoint [Julie] as my guardian, conservator, or other fiduciary, to serve without bond unless otherwise required by a court of competent jurisdiction."
Howard testified that he did not discuss the durable power of attorney with Jane and that Jane did not understand what was happening when the document was executed. He testified that, at that time, Jane was in the same state that she was in at the time of trial, "more or less." Julie did not dispute that Jane had become disabled in 1970, but she testified that Jane had probably "gone downhill" with age and that Jane had not been in the same state in 1992 as she was at the time of the trial.
Although Jane's power of attorney was signed, Howard testified that Jane could not have signed the document with her left hand and that Julie had, in fact, signed Jane's power of attorney with his permission. Julie, however, testified that she had not signed the power of attorney and that she had not been present when the document was executed. Julie also testified that Jane could, in fact, sign her own name.
At trial, Howard testified that the powers of attorney were executed to enable Julie to pay his taxes for him and, in the event anything happened to him, to give Julie the authority to bring Jane back to the United States. Julie agreed that the primary reason for the powers of attorney had been to enable her to handle Howard's and Jane's affairs if something happened to one of them in Mexico.
In 1999, Julie suggested that Howard and Jane move from Mexico to Mobile, Alabama, where Julie and her husband were living. Howard testified that Julie had informed him that she and her husband would build a house that Howard and Jane could rent from them ("the rental home"). Howard agreed, and he and Jane moved back to the United States. Howard *Page 1193 
and Jane lived with Julie and her husband until the rental house was completed.
In 2003, Howard and Jane both became ill and were hospitalized. Jane was released from the hospital before Howard was released; upon her release, Jane was placed in a nursing home. After Howard was released from the hospital, Jane continued to reside in a nursing home, but neither Howard nor Julie was satisfied with the care that Jane was receiving, so they transferred her to another nursing home. While Jane was in the second nursing home, Julie separated from her husband and moved into the rental home with Howard. Julie was satisfied with the care that Jane was receiving at the second nursing home, but Howard was not. Howard therefore checked Jane out of the nursing home and brought her back with him to the rental home.
In February 2005, Howard and Jane moved into an efficiency apartment at the Warren Inn, where they were still residing at the time of the trial. The evidence was clear that the apartment was kept clean. Howard testified that, on a typical day, he and Jane would get up around 9 a.m. Howard would wash and dress Jane and give her her vitamins and medication, then they would eat breakfast. After breakfast, Howard and Jane would usually go to the mall, where Howard would walk three miles while pushing Jane in her wheelchair. If the weather was good, they might go to the park. When they returned home, they would have lunch, and Howard would put Jane in the bed and lie with her for an hour or two. At about 4:00 p.m., they would eat and watch television or maybe go for a drive. On Sundays, if it was not raining, they would go to church.
Jane receives services from Aspera Care Hospice Group ("Aspera Care"). Aspera Care has assigned an "interdisciplinary team" to Jane's case. The team consists of a medical doctor, a registered nurse (who also serves as the case manager), a certified nursing assistant, a social worker, and a chaplain, all of whom are involved in monitoring and caring for Jane. The certified nursing assistant visits Howard and Jane's apartment twice a week and bathes and dresses Jane. At trial, two of the case managers that had been assigned to Jane's team testified; the nursing assistant, the social worker, and the chaplain assigned to Jane's team also testified. All the team members testified that they were satisfied with the care Howard was providing to Jane and that they had no concerns about his ability to care for her.
Howard testified that he and Jane are able to communicate most of the time. If he does not understand what she wants, he will ask questions until he gets a positive response from Jane. Jean Vatralis, Jane's hairdresser, testified that Howard and Jane are well suited for one another because Jane can make a noise or grunt and Howard will know what she wants. She also noted there were times when Howard would have to question Jane and that Jane would nod when he got the right answer.[1] Howard testified that there was no one else who had been with Jane enough to know what she wants and needs. The guardian ad litem reported that Howard had accompanied Jane into voting booths and had assisted her in placing her vote.
When asked why she filed the petition for guardianship, Julie testified that she had reviewed Howard's medical records and had determined that Howard was concerned and overwhelmed with caring for *Page 1194 
Jane because he realized he could not do it correctly anymore but, at the same time, he could not trust anyone else to do it. In support of her statement, Julie cited medical records in which Howard had voiced concerns about his memory. However, Dr. Daniel Koch, a clinical psychologist who had evaluated Howard, testified that psychological testing revealed that Howard did not suffer any memory deficiency. In fact, Dr. Koch testified that Howard does not have any cognitive deficits, is intellectually superior, and has above-average memory functions. Medical records did, however, reveal that Howard suffered from caregiver fatigue.
Julie testified that Howard had always taken good care of Jane but that she believed he was no longer capable of providing the type of care that Jane needed and that the records from Aspera Care suggest that Howard needed "total care help" with Jane. Further, Julie testified that she was concerned that Howard was neglecting his own health. Julie testified that Howard had checked himself out of the hospital against medical advice and had returned home so that he could be there to take care of Jane. There was also evidence indicating that Howard had decided not to have surgery to remove his prostate, even though it was likely that he had prostate cancer. Howard, however, testified that he had received conflicting opinions from medical doctors regarding whether he should have the surgery. Dr. Koch also testified that it was not unusual for Howard to not accept all recommendations with regard to his medical care. There was no evidence presented indicating that Jane had been negatively affected by any of Howard's decisions regarding his own medical care. In fact, Howard testified that he did not have health problems that kept him from taking care of Jane. The court representative noted that Howard did not want Jane placed in a nursing home because "he believes that the quality of care she receives at home is greater than the care she gets in a nursing home setting." Howard, however, "agreed that if his health were to fail that nursing home care would be necessary."
At trial Julie testified that she adores Jane and that Jane adores her. Julie testified that, if she were appointed guardian, she would seek placement for Jane at the Gordon Oaks facility. Julie testified that Gordon Oaks has three levels of care: independent living, assisted-care living, and nursing home. She had investigated the facility and had found that Gordon Oaks would evaluate Howard and Jane and place them according to their needs. Julie acknowledged that Howard and Jane may have to live across the parking lot from each other. Julie also testified that she loves Howard and Jane and that she wants them to be as close together as possible. She testified that she will help pay for Howard and Jane to live at Gordon Oaks with the money that Howard had gifted to her.
 Discussion
Alabama Code 1975, § 26-2A-104(b), provides: "Unless lack of qualification or other good cause dictates the contrary, the court shall appoint a guardian in accordance with the incapacitated person's most recent nomination in a durable power of attorney." See also Ala. Code 1975, § 26-1-2(c)(2) ("A principal may nominate, by a durable power of attorney, the guardian, curator, or other fiduciary for consideration by the court if proceedings to appoint a fiduciary for the principal are thereafter commenced. The court shall make its appointment in accordance with the most recent nomination of the principal in a durable power of attorney except for good cause or disqualification."). Pursuant to the mandatory language used by the legislature, *Page 1195 
we conclude that when a ward has nominated his or her guardian by a valid and unrevoked durable power of attorney, and protective proceedings are thereafter commenced, the probate court must, on proper petition, appoint the individual nominated in the power of attorney, unless the person challenging the nominee's appointment produces competent evidence sufficient to establish the nominee's lack of qualification or good cause dictating that the nominee should not be appointed. SeeGuardianship of Smith, 43 Mass.App.Ct. 493, 684 N.E.2d 613
(1997); and In re Sylvester, 409 Pa.Super. 439, 598
A.2d 76 (1991).
In this case, Howard asserts that the probate court erred in appointing Julie as Jane's guardian because (1) Jane's power of attorney was invalid, and (2) he presented good cause dictating that he, not Julie, should have been appointed Jane's guardian.
 The Validity of Jane's Power of Attorney
Howard asserts that Jane's power of attorney is invalid because, he says, Jane did not sign the document and, even if she did, she was not competent on the date of its execution. As to the first point, we note that the evidence was conflicting as to whether Jane signed the power of attorney. Howard testified that Jane was incapable of signing the document and that Julie, not Jane, had signed Jane's power of attorney. Jane denied that she had signed the document. The power of attorney was notarized by a notary public who attested that Jane had signed the document. The probate court evidently resolved the conflicts in the evidence in favor of a finding that the power of attorney carried Jane's genuine signature. Based on our standard of review, we must conclude that the probate court did not err in making that finding. See Shewmake v. Estate ofShewmake, 940 So.2d 260 (Ala. 2006).
As to the second point, the standard for determining whether a person is competent to execute a power of attorney is whether that person is able to understand and comprehend his or her actions. Queen v. Belcher, 888 So.2d 472, 477
(Ala. 2003). The burden initially falls on the party claiming that the person who executed the power of attorney was incompetent when he or she executed the power of attorney.Id. If, however, it is proven that the person who executed the power of attorney was habitually or permanently incompetent before executing the power of attorney, the burden shifts to the other party to show that the power of attorney was executed during a lucid interval. Id.
In this case, Howard testified that Jane could not have understood the power of attorney. Beyond that conclusory statement, however, Howard cites no other evidence indicating that Jane was mentally incompetent at the time the power of attorney was executed. On the other hand, there was evidence indicating that Jane could communicate her wishes to Howard even though she was unable to speak. In view of the state of the evidence, we cannot conclude that Howard carried his burden of proving that Jane was incompetent to execute the power of attorney.
 Good Cause to Invalidate Attorney's Appointment
Section 26-2A-104(b) requires the probate court to appoint the person nominated as guardian in the power of attorney unless the nominee is unqualified or "good cause dictates the contrary." We have found no caselaw from this or any other jurisdiction that construes the meaning of the quoted language. However, we note that one of the main purposes of a durable power of attorney is to replace *Page 1196 
costly protective court procedures and to recognize the individual's right to determine for himself or herself who shall act as his or her guardian. See Smithy43 Mass. App.Ct. at 497, 684 N.E.2d at 616-17. Therefore, we hold that a person challenging the ward's nomination contained in a durable power of attorney must present competent evidence sufficient to show good cause dictating that the nominee should not be appointed. In this context, it is not enough that the challenger prove that a better guardian could be appointed; rather, the challenger must prove that the circumstances compel the determination that the ward's selection should not be honored. Because § 26-2A-104(b) fails to delineate those circumstances, we conclude that whether "good cause" exists to deny the ward's nomination is left to the sound discretion of the probate court.
In this case, Howard presented abundant evidence indicating that he had provided good care for Jane throughout their long marriage. He also presented abundant evidence indicating that he was the person best suited to understand and respond to Jane's needs. Finally, Howard presented abundant evidence indicating that he could continue to satisfactorily care for Jane despite suggestions that his mental or physical health were deteriorating with his advanced age. However, as stated above, the issue is not whether Howard could better act as Jane's guardian, but whether good cause existed to dictate that Julie could not or should not act as Jane's guardian. In the opinion of the probate court, Howard did not carry his burden of proof. The probate court specifically found that Julie was competent and financially able to care for Jane. Based on our review of the record, we cannot conclude that the probate court exceeded its discretion in this regard. The evidence simply does not present circumstances compelling the conclusion that Jane's nomination should not be honored.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.
[1] Howard takes Jane to have her hair done once a week. Vatralis testified that Howard always brings Jane looking nice and nicely dressed. She testified that she had not witnessed anything that caused her any concern about Howard's care of Jane.