Rel: October 17, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

_____

### SC-2025-0303
_____

## Mobile Nursing and Rehabilitation Center, LLC, and Michael Britton

## v.

## Jeanne Sliman, as personal representative of the Estate of Ernest Sliman, deceased

### Appeal from Mobile Circuit Court
### (CV-25-900191)

SHAW, Justice.

Mobile Nursing and Rehabilitation Center, LLC ("MNRC"), and Michael Britton, who are defendants below, appeal from the Mobile Circuit Court's order denying their motion to compel arbitration of the wrongful-death claim asserted against them by the plaintiff, Jeanne Sliman ("Jeanne"), as the personal representative of the estate of Ernest Sliman ("Ernest"), deceased.[1]  We reverse and remand.

Facts and Procedural History

On May 15, 2023, following a history of recent falls, 84-year-old Ernest was admitted to Providence Hospital ("Providence").  Records documenting Ernest's admission reflect that while Ernest was "[a]ble [to] answer limited questions" from Providence emergency personnel, he had "a past medical history of dementia" and was "a difficult historian." Accordingly, those same records indicate, Providence personnel relied on accompanying family members and records from Ernest's prior hospitalizations to establish his relevant medical history.

Ernest's discharge plan provided for his discharge from Providence for follow-up treatment at MNRC's facility ("the nursing home"), which

---

[1]Michelle Newsome, MNRC's "Director of Nursing," was also named as a defendant.  However, the record suggests that she never appeared or answered below.

provides, among other medical care, inpatient rehabilitation services. Britton was, at all relevant times, MNRC's administrator.

In connection with and in preparation for Ernest's admission to the nursing home, Jeanne met with MNRC staff on May 18, 2023, at which time she executed various documents, including an optional "Jury Trial Waiver and Arbitration Agreement" ("the arbitration agreement"). The arbitration agreement, which identified Jeanne as Ernest's "Authorized Representative," provided, in pertinent part:

> "1. <u>Parties to the Agreement</u>: This Arbitration Agreement ('Agreement') is made and entered into between [MNRC] ('Facility') and [Ernest] ('Resident'). <u>This Agreement may be executed by 'Resident's Authorized Representative,' who is duly authorized to execute this Agreement for and on behalf of the Resident. The parties to this Agreement acknowledge and agree that upon execution, this Agreement becomes part of the Admission Agreement, and that the individuals signing this Agreement have the authority to bind their respective parties to this Agreement.</u>

> "2. <u>Scope of Agreement</u>: The parties understand and agree that all claims, disputes, and controversies of any kind between the parties arising out of or relating in any way to the Admission Agreement or any service or health care provided by the Facility to the Resident shall be resolved exclusively by binding arbitration. ...

> "It is the intention of the parties to this Agreement that it shall bind the Facility, including, but not limited to, its members, affiliated entities, parent companies, subsidiaries, representatives, medical directors, employees, officers,

3

> directors, managers, successors, assigns, agents, and the Resident and all persons whose claim arises from or relates to any service or health care provided by Facility to Resident or Resident's stay at the Facility, including, but not limited to, Resident's parents, spouse, children, grandchildren, guardian, executor, executrix, administrator, administratrix, personal representative, successor, assigns, agents, attorneys, third-party beneficiaries, insurers, trustees, next friends, legal representatives, and heirs."

(Capitalization omitted; some emphasis added.) Elsewhere, the arbitration agreement also provided: "The parties acknowledge that the Facility regularly engages in transactions involving interstate commerce and that the services provided by the Facility to the Resident involve such interstate commerce. The parties expressly agree that this Agreement shall be governed by the Federal Arbitration Act, 9 U.S.C, § 1 et seq."

On May 19, 2023, Ernest was formally discharged from Providence to the nursing home for inpatient rehabilitation. Providence's records discharging Ernest indicate that, at the time of discharge, Ernest remained "[a] poor historian [at] baseline dementia" who was "unable to recall [the] year [and had] difficulty remembering why he was [hospitalized]" but who remained "[a]wake[,] alert and oriented to self."

During his subsequent stay at the nursing home, Ernest allegedly developed a sacral pressure wound that became septic and caused his

4

family to, on June 4, 2023, remove Ernest from the nursing home against the advice of his treating physician at the nursing home. Ernest was, at that time, again hospitalized and diagnosed as being "septic secondary to [a] sacral decubitus ulcer." On July 13, 2023, Ernest died, purportedly as a result of that infection. Jeanne was appointed personal representative of his estate.

In January 2025, Jeanne, in her capacity as personal representative, filed a complaint against MNRC, Britton, and Michelle Newsome, see note 1, supra, generally alleging medical negligence in connection with Ernest's treatment at the nursing home and seeking damages. Her complaint also specifically alleged the following regarding Ernest: "At the time of his admission to [the nursing home], Ernest ... was incompetent and incapable of making decisions for himself, having previously been diagnosed with dementia, and remained in such mental condition during his entire admission to [the nursing home]."

In a subsequent joint answer, MNRC and Britton ("the MNRC defendants") asserted, among other defenses to Jeanne's claims, that "the parties are due to resolve this matter through binding arbitration." Shortly thereafter, the MNRC defendants filed a motion and supporting

brief formally requesting that the trial court compel the parties to arbitrate, in which they argued that Jeanne, who had signed the arbitration agreement as Ernest's wife and purported authorized representative, had possessed actual and/or apparent authority to bind Ernest to the arbitration agreement. Attached, among other exhibits, was a copy of the arbitration agreement and Britton's affidavit, in which he both authenticated the arbitration agreement and attested, on various grounds, that MNRC's services involved interstate commerce.

Jeanne subsequently filed a response opposing the motion to compel arbitration. Her response does not appear to dispute that an arbitration agreement that affects interstate commerce exists; in fact, she admits both the arbitration agreement's existence and that it bears her signature. Jeanne, however, disputed that she had possessed either actual or apparent authority to bind Ernest to the arbitration agreement. In particular, she maintained that the motion to compel was not accompanied by any evidence of her actual authority -- for example, a valid power of attorney -- and that, because Ernest allegedly had been "permanently incapacitated due to a diagnosis of dementia," he had been "incompetent at all times while a patient at [the nursing home]" and,

6

thus, could not be deemed to have bestowed her with apparent authority to bind him to the arbitration agreement. Jeanne's response also argued that the arbitration agreement was unenforceable to the extent that, in purported violation of federal law, see generally 42 C.F.R. § 483.70(n)(1), the MNRC defendants allegedly had failed both to inform her that its execution was optional and to verbally explain it to her.

In an attempt to demonstrate Ernest's permanent incapacity and, more particularly, his incapacity at the time of his admission to the nursing home on May 19, 2023, Jeanne's response explained that Ernest "had a previous diagnosis of dementia" from his primary physician and was, at all relevant times, purportedly taking two prescription medications to combat symptoms of that condition. She further relied on the Providence admission records, which are discussed above and which Jeanne characterized as "show[ing] that [Ernest's] mental condition had deteriorated to the point where he was unable to provide any information to the Providence doctors and nurses" at the time of his hospital admission.

Jeanne also attached to her response copies of MNRC's own records evaluating and documenting Ernest's mental acuity during his stay at

7

the nursing home, which, she asserted, confirmed Ernest's dementia diagnosis and confusion, classified his level of consciousness as being "[in a] stupor," described him as mentally suffering "severe impairment," indicated that both his "recent memory" and "remote memory" were "abnormal," and documented his "[d]eficits in judgment." Jeanne further cited the results of an assessment performed by MNRC employees, which concluded that Ernest lacked the ability to make personal medical decisions and was, in fact, unable to recall that he was housed in a skilled-nursing facility.[2]

Finally, Jeanne submitted in support of her response, her own affidavit, attesting, in pertinent part:

> "… Based on my personal observations of living with [Ernest], it was clear to me and my children that [Ernest] was not capable of handling his own affairs as of May 18, 2023. He had significant issues with memory, both short-term and long-term, beginning 2-3 years prior to him passing. Beginning in 2020, [Ernest's] ability to make decisions for himself began to worsen, as he began to not understand what needed to be done to take care of himself. As a result, beginning in 2021, I was required to take over all of the decisions related to [Ernest's] health, welfare, and financial needs.

---

[2]That same assessment, which was administered on May 26, 2023, ultimately concluded that Ernest was "moderately impaired" at the time, such that he made poor decisions and required supervision.

"… I began to notice [Ernest's] inability to care for himself and make decisions for himself in 2020. At that time, I was becoming worried for my husband, as he was becoming more and more forgetful.

"… [Ernest] was still driving, a little, in 2021. However, he began forgetting where he was going or why he was driving. Eventually, his memory deteriorated so bad that he could not remember how to get home. Because of this, he stopped driving in 2021.

"… From that point, [Ernest's] mental condition continued to decline. Beginning in 2021, I had to start making decisions for him, including handling all of the financial aspects of our home, as well as making sure [Ernest] had regular doctor visits. By 2022, it was clear that there was something significantly wrong with my husband from a mental standpoint. I would therefore … go with him when he met with his doctors, as he could not remember why he needed to see a doctor, or explain to his doctors any issues he had with his health. And he certainly could not remember what the doctor's orders were or the recommendations that the doctors gave him. Finally, about a year or a year and a half before he died, I explained all these issues to Dr. Eric Johnson, [Ernest's] primary care physician, at one of [Ernest's] doctor appointments. After conducting his examination, Dr. Johnson diagnosed my husband with dementia.

"… Unfortunately, [Ernest's] mental issues only got worse after his diagnosis, which we were told would happen. He could not remember when to take his medicine, or even that he needed to take his medicine, as he was not capable of understanding the instructions on his medicine label. Because of this, each Sunday I would fill his pill box with his daily medications. Then, each morning and evening, I would be the one to make sure [Ernest] took his medicine, because he could not remember on his own.

9

"... After he stopped driving, [Ernest] pretty much stayed home with me. [Ernest] liked to watch TV. But when he watched TV, he would often look at me and ask me what he was watching. And when he watched a movie that he liked or that he had seen before, he would ask after watching the movie[,] 'What did I just watch?' I would have to explain to him that he just watched one of his favorite shows or movies.

"... [Ernest] was also a huge New Orleans Saints fan. However, I recall the season before he passed that he would call our son, George, to find out when the game started. George would tell him, and he would hang up. Then, five minutes later, he would call George again to ask him when the game started. This is just an example of how the dementia had taken away [Ernest's] short term memory.

"... [Ernest] knew who I was, and his children, but when I would mention his grandchildren or great-grandchildren by name, he would ask[,] 'Who are you talking about?' I would tell him I was talking about the grandchildren, and tell him their names. ... After telling him the names of some of our grandchildren or great grandchildren, and asking if he remembered them, he would respond by saying[,] 'I don't know who you are talking about. I don't have any grandchildren.' This started I believe in 2022 and continued until he went into the nursing home.

"... Further, in the months prior to his passing, [Ernest] also could not remember to eat, or that he had just eaten. So I was responsible for preparing the meals, making his plate, and then telling him its time to eat.

"... By the time that [Ernest] was admitted to Providence in May of 2023, just before he was admitted to [the nursing home, Ernest] was 100% dependent upon me and his family for making decisions for him, as he simply was not able to understand the situation he may be in, be able to express his needs, or make decisions for himself. This occurred when

10

he was admitted to Providence in May of 2023, and later to the nursing home. At both of these admission[s], [Ernest] was not able to explain where he was at the time, why he was there, or what type of problems he was having. And if he did respond, it would be wrong or something that happened years ago. Because of this, the doctors and nurses were required to talk to either myself, one of our children, or grandchildren.

"… Another example of how bad [Ernest's] mental status had deteriorated was during his admission to [the nursing home]. Every time I would talk to [Ernest], he would tell me[,] 'Get me out of here. These people are trying to kill me.' I knew this was not true, and was just an example of him being delusional. After he would tell me this, I would just try to comfort and talk to him so as to calm him down. He never even knew he was in a nursing home, or the reason we admitted him into a nursing home.

"… And then there were times when the nursing home nurses and physical therapists could not get [Ernest] to take his medicine, eat his food, or participate in [physical therapy]. The staff would tell me about this, and I would have to go in and try to explain to [Ernest] that the people at the nursing home were there to help him get better. He would respond by saying[,] 'I don't know who these people are,' and that he 'just wanted to go home.'

"… These are just a few examples of how bad [Ernest's] dementia had progressed. In summary, prior to and throughout his admission to the nursing home, [Ernest] was not mentally capable of handling his own affairs. He did not understand or have the ability to comprehend a given situation, how to address a situation, or to make decisions for himself. [Ernest] relied 100% upon me and my children to handle all of his decisions for him."

In a reply to Jeanne's response, the MNRC defendants, while

conceding that Ernest admittedly had some level of mental impairment, disputed that Jeanne's response demonstrated Ernest's actual, legal incompetency <u>at the precise time</u> she executed the arbitration agreement on his behalf. They noted that no mental assessment had been performed contemporaneously with the execution of the arbitration agreement and that MNRC's records, on which Jeanne had relied in opposing arbitration and in asserting that MNRC also had agreed that Ernest had lacked the ability to make his own medical decisions, had all been completed after Ernest's admission to the nursing home.

According to the MNRC defendants, the admission records, while noting some "confusion" by Ernest at the time he arrived at the nursing home on May 19, 2023, also reflected that Ernest was "alert" and was "verbally responsive." The MNRC defendants further attached to their reply an activities-assessment form, which also was completed on May 19, that reflected that Ernest was, at that time, able to state his preferred times for rising and going to bed and for napping, knew that he was married with children, preferred to listen to rock-n-roll music, and enjoyed watching certain types of television programs. Based on her interaction with Ernest on May 19, the MNRC activities director

indicated on the form supplied by MNRC that Ernest was not suffering from any apparent cognitive impairment during the interview on that date and that he was, at least at that time, "[a]ble to make [his] own decisions."

Moreover, according to the MNRC defendants, Jeanne, regardless, possessed apparent authority to execute the arbitration agreement under "the doctrine of 'passive ratification.'" They further disputed whether, even if true, Jeanne's representations about the MNRC defendants' purported failure to adequately explain the arbitration agreement to her would invalidate it.

Jeanne, nonetheless, continued to dispute that Ernest was intermittently competent. In further rebuttal of the MNRC defendants' position, she submitted additional documentation reflecting that another MNRC employee had, on May 19, 2023, described Ernest as "moderately impaired" while attempting to evaluate his bladder function.

The trial court apparently agreed with Jeanne, and, following a hearing,[3] denied the motion of the MNRC defendants seeking to compel

---

[3]A transcript of the hearing was not included with the record on appeal; however, there is nothing to suggest that additional evidence on the issue of Ernest's incapacity was submitted at that hearing.

13

arbitration.

Thereafter, the MNRC defendants filed a postjudgment motion seeking relief from the trial court's order based on purported new evidence. In support, they included records generated on June 5, 2023, and June 8, 2023, in connection with Ernest's hospitalization upon his removal from the nursing home, which, they maintained, had not been produced by Jeanne until after the hearing on the motion to compel arbitration. According to the MNRC defendants, even through the exercise of due diligence, these newly discovered records could not have been discovered by them before the entry of the trial court's order denying their motion to arbitrate. Specifically, the MNRC defendants argued that the additional records, which they characterized as relevant to Ernest's disputed competency, had not been available to them at the time of their motion to compel or at the time of the hearing on that motion for the following reasons: the records were not included in Ernest's MNRC medical chart because they had not been generated until after his discharge from the nursing home, no order authorizing the MNRC defendants to obtain Ernest's complete medical records or other protected health information under the federal Health Insurance Portability and

14

Accountability Act had yet been entered by the trial court, and the MNRC defendants had not engaged in discovery in order to avoid any potential argument that they had waived the right to arbitrate.

As emphasized in their accompanying motion, the June 5, 2023, record submitted by the MNRC defendants reflected that Ernest had been, "[a]t baseline, ... able to ambulate with a walker and ... hold a conversation and do activities of daily living" and that he "was at his baseline after recent discharge and [his] mental status change occurred in [the] last few days." The record allegedly generated on June 8, 2023, further represented that, as reported by Ernest's daughters, "2 months ago [Ernest] was ambulating with a walker and eating just fine" -- characteristics that, according to the MNRC defendants, were relevant to and supported their position that Ernest was not permanently incompetent, as Jeanne alleged.

The trial court denied the MNRC defendants' postjudgment motion;[4] they now appeal. See Rule 4(d), Ala. R. App. P.

### Standard of Review

"'"[T]he standard of review of a trial court's

_____

[4]It is unclear whether, in doing so, the trial court considered the purported new evidence offered by the MNRC defendants.

15

ruling on a motion to compel arbitration at the instance of <u>either party</u> is a <u>de novo</u> determination of whether the trial judge erred on a factual or legal issue to the substantial prejudice of the party seeking review." <u>Ex parte Roberson</u>, 749 So. 2d 441, 446 (Ala. 1999). Furthermore:

> "'"A motion to compel arbitration is analogous to a motion for summary judgment. <u>TranSouth Fin. Corp. v. Bell</u>, 739 So. 2d 1110, 1114 (Ala. 1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that that contract evidences a transaction affecting interstate commerce. <u>Id.</u> 'After a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.'"
>
> "'<u>Fleetwood Enters., Inc. v. Bruno</u>, 784 So. 2d 277, 280 (Ala. 2000) (quoting <u>Jim Burke Auto., Inc. v. Beavers</u>, 674 So. 2d 1260, 1265 n.1 (Ala. 1995) (emphasis omitted)).'
>
> "<u>Vann v. First Cmty. Credit Corp.</u>, 834 So. 2d 751, 752-53 (Ala. 2002)."

<u>Elizabeth Homes, L.L.C. v. Cato</u>, 968 So. 2d 1, 3 (Ala. 2007).

<u>Discussion</u>

16

As the parties separately represent to this Court, it appears undisputed that the MNRC defendants carried their initial burden of demonstrating that a written arbitration agreement affecting interstate commerce exists and that the agreement, which indisputably was not signed by Ernest, bears Jeanne's signature. See Elizabeth Homes, supra. See also Stephan v. Millennium Nursing & Rehab Ctr., Inc., 279 So. 3d 532, 539 (Ala. 2018) (explaining that, "[i]n general, 'a nonsignatory to an arbitration agreement cannot be forced to arbitrate [his] claims,'" but noting an exception to that general rule "'when arbitration agreements [are] executed by the owners and operators of nursing homes and their residents and/or their residents' family members'" (citations omitted)). The parties disagree, however, regarding whether, in response, Jeanne demonstrated that she is nonetheless not bound to arbitrate.[5]

---

[5]The parties further disagree regarding whether the circumstances surrounding MNRC's presentation of the arbitration agreement to Jeanne complied with federal law when, according to Jeanne, she was informed that she had to sign all provided paperwork to complete Ernest's admission and purportedly received only the signature page rather than the entire document containing the arbitration agreement. See 42 C.F.R. § 483.70(n)(1) (explaining that a facility receiving Medicare or Medicaid funding may not require a resident to sign an arbitration agreement as a condition of admission). The record reflects, however, that, despite her representations as to the circumstances surrounding the execution of the arbitration agreement, Jeanne specifically initialed the

Under Alabama law, to avoid being bound to arbitrate the wrongful-death claim against the MNRC defendants, Jeanne, in response to the MNRC defendants' showing, was required to demonstrate either that Ernest was permanently incapacitated, i.e., that Ernest experienced no lucid intervals, or that he was temporarily incapacitated at the time she signed the arbitration agreement, thus divesting him of the ability to bestow on her apparent authority to act on his behalf. See Stephan, 279 So. 3d at 539-46 (holding that the doctrine of apparent authority does not apply when a nursing-home resident lacked the mental capacity to give the signatory the authority to act on his behalf).

The Court, in Stephan, explained:

_____

page of the arbitration agreement both identifying it as "[v]oluntary" and explaining the fact that its execution was "not a condition of admission" to the nursing home. In any event, Jeanne fails to identify any authority establishing that the circumstances she alleges surrounding the presentation of the arbitration agreement to her would actually invalidate the arbitration agreement, and her allegation that she was fraudulently induced to execute it was not raised to or addressed by the trial court. See also Northport Health Servs. of Arkansas, LLC v. United States Dep't of Health & Hum. Servs., 14 F.4th 856, 868 (8th Cir. 2021) (explaining that if a "facility entered into an arbitration agreement with a resident without complying with the Revised Rule by requiring the resident to sign as a condition of admission to the facility, see 42 C.F.R. § 483.70(n)(1), the arbitration agreement would nonetheless be enforceable, absent a showing of 'generally applicable contract defenses, such as fraud, duress, or unconscionability'" (quoting AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011)).

"Before determining whether [the alleged agent] had the apparent authority to execute the agreement, the Court must decide whether [the resident], on whose behalf the agreement was signed, was mentally competent at the time [the alleged agent] signed the agreement. [The nursing home] argues that [the alleged agent] has not met her burden of proving [the resident's] incapacity. Specifically, [the nursing home] argues that [the alleged agent] has failed to demonstrate that [the resident's] advanced age and dementia resulted in anything more than short-term memory loss.

"In Troy Health & Rehabilitation Center v. McFarland, 187 So. 3d 1112 (Ala. 2015), this Court discussed the enforceability of an arbitration agreement and whether a nursing-home resident was mentally competent when he executed a durable power of attorney naming his nephew as his attorney-in-fact. We find the following reasoning from that case to be analogous:

> "'"[T]he standard for determining whether a person is competent to execute a power of attorney is whether that person is able to understand and comprehend his or her actions. Queen v. Belcher, 888 So. 2d 472, 477 (Ala. 2003). The burden initially falls on the party claiming that the person who executed the power of attorney was incompetent when he or she executed the power of attorney. Id. If, however, it is proven that the person who executed the power of attorney was habitually or permanently incompetent before executing the power of attorney, the burden shifts to the other party to show that the power of attorney was executed during a lucid interval. Id."

19

"'Yates v. Rathbun, 984 So. 2d 1189, 1195 (Ala. Civ. App. 2007).'

"187 So. 3d at 1119.

"We held that the presumption is that every person has the capacity to understand until the contrary is proven. McFarland, 187 So. 3d at 1119 (citing Yates v. Rathbun, 984 So. 2d 1189, 1195 (Ala. Civ. App. 2007), Thomas v. Neal, 600 So. 2d 1000, 1001 (Ala. 1992), and Hardee v. Hardee, 265 Ala. 669, 93 So. 2d 127 (1956)). The Court differentiated between the burden of proving permanent incapacity and temporary incapacity. Specifically, we held that proof of incapacity

"'"'"at intervals or of a temporary character would create no presumption that it continued up to the execution of the instrument, and the burden would be upon the attacking party to show [incapacity] at the very time of the transaction."'" Wilson v. Wehunt, 631 So. 2d 991, 996 (Ala. 1994) (quoting Hall v. Britton, 216 Ala. 265, 267, 113 So. 238, 239 (1927) (emphasis added)).

"McFarland, 187 So. 3d at 1119.

"Thus, a party seeking to avoid a contract based on the defense of incapacity must prove either permanent incapacity or contractual incapacity at the very time of contracting. See Ex parte Chris Langley Timber & Mgmt., Inc., 923 So. 2d 1100, 1106 (Ala. 2005). The party seeking to avoid the contract bears the burden of proving incapacity to contract by a preponderance of the evidence. See Hester v. Hester, 474 So. 2d 734, 736 (Ala. Civ. App. 1985)."

279 So. 3d at 539-40 (footnotes omitted).

A.    Permanent Incapacity

20

Here, Jeanne's response opposing enforcement of the arbitration agreement included her representations that Ernest was totally and permanently incapacitated at the time of his admission to the nursing home. As support for that contention, Jeanne's affidavit included anecdotes evidencing, in addition to his formal dementia diagnosis, the onset of Ernest's memory loss and his purported deteriorated mental state, which, she says, required her to handle the couples' business affairs and rendered Ernest incapable of caring for himself.

As explained above, our precedent explicitly rejects the notion that even a diagnosis of chronic dementia, alone, equates to permanent incapacity. See, e.g., Troy Health & Rehab. Ctr. v. McFarland, 187 So. 3d 1112, 1120 (Ala. 2015) (plurality opinion). Instead, as our decisions observe, a dementia diagnosis suggests, in addition to intervals of confusion, the possibility of lucid intervals during which the individual would be capable of either bestowing authority to act on his or her behalf or capable of ratifying actions taken on his or her behalf. See id. at 1119. See also Wells v. Wells, 49 So. 3d 216, 223 (Ala. Civ. App. 2010). Under Stephan, Jeanne bore the burden of proving Ernest's incapacity. 279 So. 3d at 540.

21

Here, the Providence records generated immediately before Ernest's admission to the nursing home suggest that, while he suffered from documented memory issues, Ernest remained, at least at times, awake, alert, oriented, and capable of responding to direct questions. Similarly, the purported new evidence submitted by the MNRC defendants in support of their postjudgment motion reflects that Ernest reportedly was at his baseline at the time of his discharge from Providence and transfer to the nursing home and was capable of intelligible conversation and to "do activities of daily living." The MNRC records, while likewise noting Ernest's confusion, also indicated that on May 19, 2023 -- the day following the execution of the arbitration agreement -- he was able to clearly respond to direct questions about his interests and preferences and was considered by MNRC staff to be capable of making his own decisions at that time. In fact, in her brief to this Court, Jeanne acknowledges that Ernest's medical records reflect that, despite his dementia diagnosis, Ernest remained "[a]ble [to] answer limited questions."

Even assuming that Ernest required assistance with the activities of daily living or with his personal business affairs, as Jeanne's affidavit

asserts, those circumstances would not be determinative on the issue of his permanent incapacity. Cf. TitleMax of Alabama, Inc. v. Falligant, 328 So. 3d 244, 255 (Ala. 2020) (plurality opinion) ("[E]vidence indicating that [an individual] suffers from an undefined mental illness, that she lacks the ability to manage her financial affairs, and that she did not understand the terms of the contracts is not sufficient evidence to create a genuine question of fact as to whether she is permanently incapacitated and, thus, unable to contract." (emphasis added)). We further note that the majority of the incidents Jeanne describes and Ernest's documented inability to recount his own medical history suggest that Ernest's dementia primarily affected his short-term memory and produced related confusion. Despite that, Jeanne's affidavit suggests that Ernest nonetheless remembered immediate family members, including Jeanne, knew how to contact them via telephone, and also remembered and was able to engage in activities he enjoyed. Moreover, MNRC records supplied by Jeanne in opposing arbitration indicate that, while he was in the nursing home, Ernest was able to accurately "state[] that he lives at home with his wife." An MNRC physical-therapy progress report recounting the circumstances of Ernest's living arrangements further

reflected that, although he required daily assistance, Ernest "may be left alone 6-8 hours or more."

Accordingly, as in <u>Stephan</u>, it has not been established that Ernest was permanently incapacitated at the time of his admission to the nursing home. 279 So. 3d at 540 (rejecting claim of permanent incapacity when, despite records indicating that the nonsignatory was "'not oriented'" and clearly suffered from progressive memory loss, the nonsignatory nonetheless remained "able to follow commands and sometimes converse with the physician"). See also <u>Troy Health & Rehab. Ctr.</u>, 187 So. 3d at 1121 (declining to find determinative an alleged incapacitated person's inability "to correctly state the year, month, or day of the week" on one medical form when other forms indicated that he "had clear speech, that he was usually able to make himself understood, that he was usually able to understand others, and that he did not have any signs of inattention, disorganized thinking, or an altered level of consciousness"). <u>Cf.</u> <u>Diversicare Leasing Corp. v. Hubbard</u>, 189 So. 3d 24, 37 (Ala. 2015) (affirming trial court's denial of a motion to compel arbitration when the undisputed evidence demonstrated that, at the time of the patient's admission, he "had the mental capacity of 'an infant' or a

'toddler' and that he was totally dependent upon others for his care because he was confined to a wheelchair; he had no use of his hands; he could not speak; and he could not feed, clean, or dress himself"), and Noland Health Servs., Inc. v. Wright, 971 So. 2d 681, 686 (Ala. 2007) (plurality opinion) (finding representative's signature ineffective in binding to arbitration " 'an 86 year old demented female' ... who was '[n]ot oriented to person, place or time' " and was ' "always confused' " (emphasis omitted)).

B.    Temporary Incapacity at Execution

Alternately, to avoid arbitration, Jeanne could have demonstrated that, on May 18, 2023, when she executed the arbitration agreement as Ernest's purported authorized representative, Ernest was, at that precise time, temporarily incapacitated so as to render him incapable of authorizing her to have done so.  See Stephan, 279 So. 3d at 540.  In this case, as we have concluded above, the evidence failed to establish that Ernest was permanently incapacitated.  Jeanne would thus have had to successfully demonstrate that, when she completed his admission paperwork to the nursing home, including the arbitration agreement, on May 18, 2023, Ernest was not experiencing one of the intervals during

25

which he remained lucid and communicative with medical staff.

A review of the record reveals that none of the medical records submitted to the trial court appears to have been prepared on May 18, 2023. That failure alone appears potentially determinative under Stephan. See id. Further, records created following Ernest's admission to the nursing home would not be determinative on this issue -- especially because they are potentially skewed by Ernest's deterioration attributable to the potential effects of his progressing infection, as alleged in Jeanne's complaint.[6]

There are, however, as explained above, available medical records

---

[6]In fact, a "Resident Information" sheet completed on May 22, 2023, while noting that Ernest remained able to feed himself, was able to brush his own teeth, and was "[a]lert," indicated that he did display cognitive confusion. While also noting Ernest's preexisting dementia diagnosis, that form also indicated that, although he remained able to generally initiate conversation and specifically to converse regarding Jeanne and their children, Ernest had experienced "[r]ecent changes in cognition." By the time of an evaluation performed on May 29, 2023, Ernest's cognition had apparently declined from the documented "moderately impaired" condition he had displayed at admission to "severe impairment." (Capitalization omitted.) Regardless, a physical-therapy progress note indicated that, as of May 30, 2023, Ernest still displayed the "[a]bility to follow 1-step directions" and was also "[a]ble to make his needs known." Similarly, at the time that his family members removed him from the nursing home on June 3, 2023, they reportedly described Ernest's condition as "'more sedative and lethargic' than usual."

documenting Ernest's mental cognition as of May 19, 2023 -- the day following execution of the arbitration agreement. Specifically, during his consultation with the MNRC activities director on that date, Ernest was, based on information that he directly provided, reportedly "alert and able to make his needs [and preferences] known." The activities director also specifically indicated that Ernest was not cognitively impaired at that time and concluded that he <u>was</u> capable of making his own decisions. MNRC records completed at 8:28 p.m. on that same date also suggest that, at the time he was transferred from Providence and admitted to his room at the nursing home, Ernest was "alert, and verbally responsive with some noted confusion." Similarly, the Providence discharge records later produced by the MNRC defendants suggest that Ernest was discharged at his baseline, which family members had apparently reported as his being able both to carry on intelligible conversations and to perform general activities of daily living.

As Jeanne pointed out in opposing arbitration below, the record indisputably does contain other MNRC records prepared on May 19, 2023, which suggest that MNRC, too, concluded that Ernest was "moderately impaired" -- which MNRC described as "frequently confused

27

and disoriented; decisions poor; requires care and supervision" -- as opposed to "severely impaired" -- which it defined as "continual confusion; decisions never or rarely made/also includes comatose resident." The record also includes a mental-health screening prepared by Providence staff at 11:38 a.m. on May 19, 2023, which described Ernest's "level of consciousness" at that time as "[s]tupor." We can only conclude that these varying reports bear out the theory established by our caselaw that a dementia patient experiences noted -- and potentially frequent -- fluctuations in cognition.

In sum, while Ernest at times indisputably suffered from documented memory loss and bouts of confusion, from our de novo review of the record, we simply cannot conclude that Jeanne adequately demonstrated that he was experiencing such significant symptoms at the time she executed the arbitration agreement in this case. While Ernest had suffered a series of recent falls and had been taken to Providence for evaluation of the weakness to which he attributed his falls and a possible resulting knee injury, testing revealed that his knee was "normal." Similarly, no other acute injuries or treatment needs were documented at that time, and Ernest was apparently transferred to the nursing home

28

for physical therapy to target his balance and mobility issues. Moreover, when at Providence, Ernest was reportedly "[a]wake[,] alert and oriented to self [although] unable to recall [the] year" and was also "[a]sking when he [could] go home." Therefore, unlike the patient in Stephan, who was noted to have been recovering from a reconstructive hip surgery on top of his dementia diagnosis at the operative time, or the resident in SSC Montgomery Cedar Crest Operating Co. v. Bolding, 130 So. 3d 1194 (Ala. 2013), who had been hospitalized after suffering a stroke and a heart attack, we see nothing suggesting an accompanying acute medical diagnosis that might have exacerbated Ernest's noted dementia and would accordingly establish his temporary incapacity on May 18, 2023. See also Troy Health & Rehab. Ctr., 187 So. 3d at 1114 (rejecting, despite submission of evidence that the plaintiff's decedent had been diagnosed with both "'altered mental status'" and "'alcohol persistent dementia,'" the notion that the plaintiff had successfully demonstrated either the decedent's permanent incapacity or his temporary incapacity at the time the decedent executed a power of attorney).

## Conclusion

29

We hold that the trial court erred in denying the MNRC defendants' motion to compel arbitration; thus, we reverse the trial court's order denying that motion and remand the case for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

Stewart, C.J., and Bryan, Mendheim, and McCool, JJ., concur.